# In the
# United States Court of Appeals
## For the Seventh Circuit

———————

Nos. 03-3578 & 03-3687

PAUL S. HAMMEL,

*Plaintiff-Appellant, Cross-Appellee*,

*v.*

EAU GALLE CHEESE FACTORY,

*Defendant-Appellee, Cross-Appellant.*

———————

**Appeals from the United States District Court
for the Western District of Wisconsin
No. 02-C-0405-C—Barbara B. Crabb**, *Chief Judge.*

———————

ARGUED APRIL 1, 2004—DECIDED MAY 11, 2005

———————

Before FLAUM, *Chief Judge*, and COFFEY and EVANS, *Circuit Judges*.

COFFEY, *Circuit Judge*. Paul Hammel, who had previously been adjudged legally blind, began his employment as a general laborer at the Eau Galle Cheese Factory ("EGC"), in Durand, Wisconsin, on January 8, 2000, and was discharged just three weeks later, on January 27, 2000. Shortly thereafter Hammel sued EGC claiming he was unlawfully terminated on the basis of his disability, in violation of the Americans with Disabilities Act ("ADA"), 42

U.S.C. §§ 12111 *et seq.* After a bench trial, the district court ruled that Hammel was not a "qualified individual" within the meaning of the ADA and entered judgment as a matter of law in EGC's favor. *Hammel v. Eau Galle Cheese Factory*, No. 02-C-0405-C, 2003 U.S. Dist. LEXIS 11380, at *2 (W.D. Wis. June 26, 2003). We affirm.

## I. Background

Hammel suffers from congenital glaucoma in both eyes,[1] is without any sight in his right eye, retains only gun-barrel vision[2] in his left eye and thus is considered legally blind.

---

[1] Congenital glaucoma is a disease, present from birth, "associated with abnormal pressure inside the eye, which eventually causes damage to the optic nerve and permanent loss of vision." EyeMDLink.com, Congenital Glaucoma, at http://www.eyemdlink.com/Condition.asp?ConditionID=2#c (last updated Nov. 1, 2004).

[2] "Gun-barrel vision," more commonly known as "tunnel vision," is a condition commonly associated with advanced glaucomatous optic nerve damage and is characterized by a severe constriction in a person's visual field. DORLAND'S ILLUSTRATED MEDICAL DICTIONARY, *available at* http://www.mercksource.com/pp/us/cns/cns_hl_dorlands.jspzQzpgzEzzSzppdocszSzuszSzcommonzSzdorlandszSzdorlandzSzdmd_v_10zPzhtm; *see* Mid-America Eye Center, Glaucoma, *at* http://www.midamericaeye.com/surgeries/glaucoma.html (last updated April 15, 2004). A person who suffers from gun-barrel vision "views the world as though s(he) were looking at the world through a tube." THE JKL MEDICAL DICTIONARY, *available at* http://www.jklcompany.com/a.html (last updated May 21, 2001). However, "when due to organic causes such as glaucoma . . . the [vision] field expands at increasing distance." Mid-America Eye Center, Glaucoma, at http://www.midamericaeye.com/surgeries/glaucoma.html (last updated April 15, 2004). In Hammel's case, he described having "no peri-
(continued...)

*Id.* at \*3. To help compensate for his loss of vision, Hammel has received training at vocational schools in the use of adaptive workplace techniques, and with this training has been able to secure work performing various jobs on a temporary basis.

In January 2000, Hammel applied for a position as a general laborer with the defendant, Eau Galle Cheese Factory in Durand, Wisconsin, and was granted an interview with EGC's business manager, Ron Hemmy. *Id.* at \*5. During the interview Hammel related that he suffered from glaucoma and advised his interviewer of the limitations caused by his disability. *Id.* After having the job's requirements explained to him, Hammel assured Hemmy that he would be able to perform the necessary tasks without any special accommodation. Hemmy agreed to hire him on a trial basis and informed him that his employment would be conditional and subject to "a probationary period of 90 days." *Id.* at \*6. That same day Hammel was given a tour of the factory and a list of his duties and introduced to his supervisor, John Anibas. He was also introduced to a number of his co-workers who in turn demonstrated what his essential duties would be and put him to work.

### A. Hammel's Job Performance

The general laborers at EGC, such as Hammel, convert cheese curds into the hard Italian cheeses that EGC produces, and while doing so they are required to perform a variety of tasks at EGC's factory in two separate work

---

[2] (...continued)
pheral vision beyond the 20 degree corridor in front of his left eye . . . [but the] visual field in front of his left eye is greater the further away he is from an object."

areas; the "make room" and the "brine room."[3] The employees are expected to perform the tasks assigned in a rapid and efficient manner, while working in close quarters side-by-side.

According to his supervisors, John Anibas, Dan Simpson, and Doug Smith, Hammel had problems performing many of his duties from day one. For example, they explained that, as part of his duties, Hammel was expected to mold cheese curds into "cheese wheels," and to "turn" or "flip" the wheels in a manner that would ensure that the final product would have a uniform finish. On a number of occasions Hammel failed to properly perform this task, resulting in a defective and unsaleable product. During the production process, part of Hammel's job, like his co-workers, was to remove the cheese wheels from the brine tanks and stack them uniformly on drying racks, but on many occasions he failed to place the cheese wheels properly on the racks, thus allowing the soft, still pliable wheels of cheese to hang over the edge causing a portion of the product to be wasted and drop to the floor. In addition, the cheese wheels had to be stamped with the production date in order that they could be tracked in case of contamination. Anibas noted that Hammel "did not always stamp each cheese" as was instructed, either stamping the cheese illegibly or failing to properly apply the stamp to the finished product. *Id.* Another example of Hammel's lack of attention or aptitude was evidenced in his repeated difficulty stacking the cheese in a manner so as to prevent them from being damaged by tipping over and falling off the pallet and/or causing a safety hazard. Furthermore his supervisors related that Hammel failed to "keep the stacks of cheese wheels level," resulting in unbalanced pallets that posed the risk of toppling over. *Id.* Anibas observed that, in general, Hammel also "worked

---

[3] For a more detailed description of the duties of a general laborer at EGC, *see Hammel*, 2003 U.S. Dist. LEXIS 11380, at *6-7.

too slowly at his tasks to keep up with the speed of [the] cheese production" line. *Id.* at *9.

Aside from a general lack of aptitude and/or ability, Hammel also was known to exhibit a poor attitude and perform many of his tasks carelessly and without regard for his safety or that of his co-workers. Indeed, Simpson "thought the plaintiff seemed eager to work during his first week but seemed to lose interest during the second week, when he spent more time talking with his co-workers and taking breaks than doing his job." Simpson stated that he observed Hammel literally slamming "cheese rounds down on the work table," a dangerous act which "pos[ed] a risk to other workers who were at the same table [considering] [t]he wheels weigh about 30 pounds or more and could inflict injury if they landed on someone's hand or foot." *Id.* at *10. On another occasion, an employee watched Hammel drive an electrically powered pallet jack bearing a pallet of finished cheese wheels into the wall, causing the wheels of cheese to fall off.[4] *Id.* at *12. His supervisors on occasion expressed concern and fear that Hammel might be seriously injured by tripping over hoses that were strategically positioned on the factory floor to wash away excess brine. In addition, Simpson frequently observed Hammel banging into the factory machinery (*e.g.*, hitting his head on the press rack) and Hammel even made a point of showing him bruises on his legs that were presumably a result of

---

[4] In the words of a co-worker who observed the incident: "[H]e was driving the electric pallet jack, and all of a sudden the doors [to the adjoining room] went whoop, and they come [sic] slamming open . . . and he come [sic] out, spun a circle and slammed right into the wall. And half of the [cheese wheels] fell off . . . . he didn't act like it was a very big deal at all. We just picked the [cheese wheels] up . . . . [h]e just shrugged it off, laughed it off . . . . I've never seen anybody ram a wall like that in my life. I mean, he hit the wall at full bore."

Hammel's bumping into things. *Id.* at \*10. Furthermore, in disregard for his safety, Hammel repeatedly placed his hands not only on top of but also inside the grinding machine when using the apparatus,[5] even after having been ordered by Simpson to cease and desist from such a practice. Eventually Simpson was forced to prohibit Hammel from operating the grinding machine after EGC's owner, John Buhlman "saw [Hammel] putting his hands on top and told Simpson not to [allow him to] operate the grinder anymore." *Id.* at \*10-11. When told by Simpson that "he could no longer operate the grinder, [Hammel] acted disgusted with Simpson." *Id.*

Hammel's run-in with Simpson was not the only time he demonstrated a propensity for arrogance and insubordination. Hammel also continued to make personal phone calls on company time in spite of the fact that he had been frequently told by Anibas not to do so and also "walked away from his post whenever he wanted to go outside for a cigarette." On one occasion Hammel went so far as to taunt Smith after he (Hammel) had been reprimanded for taking an unauthorized break by mocking him and, "in an offensive tone . . . [saying] 'Here I am Dougie, Dougie, what do you want me to do now?'" *Id.* at \*9. Particularly telling is Hammel's coworkers description of him as a "slacker" with a poor attitude.

Hammel's supervisors initially used remedial measures in an attempt to address his mounting performance problems. They warned Hammel that he needed to be more careful, instructed him to speed up or slow down when performing certain tasks that the job demanded, as well as time and again ordering him to stop taking unauthorized work breaks. In an attempt to accommodate Hammel and

---

[5] Which was used to grind and recycle cheese rinds discarded during processing.

believing that he could more efficiently operate in the factory atmosphere, Anibas arranged for Hammel to work in the make room on a regular basis, "despite the fact that [EGC's] practice was to rotate the general laborers between the make room and the brine room." *Id.* However, even with this accommodation, Hammel's work performance failed to improve and his supervisors eventually decided they had to meet with Hemmy to relay their concerns. Specifically, they informed Hemmy of Hammel's work problems, such as his insubordination, poor attitude and work ethic, and related their concerns about his carelessness. After discussing the matter, Hemmy decided that the only course of action remaining was to terminate him. Hemmy later met with Hammel and informed him that he was being discharged due to his limited vision and the fact that it "interfered 'to some extent' with his work and caused [management] concern for his safety and the safety of his coworkers." *Id.* at *13.

## B. Hammel's ADA Claims

In July 2002, Hammel responded to his termination by filing suit against EGC under the ADA, alleging in his complaint that EGC intentionally discriminated against him in discharging him on the basis of his disability and failing to afford him reasonable accommodations. EGC, in their answer, denied discharging Hammel "because of" his disability, and instead claimed that he was let go because of his insubordination, consistent carelessness, poor work attitude/ethic, and "concerns for his safety and the safety of other employees." In addition, EGC claimed that they had been unable to work out any reasonable accommodations for Hammel, but did not challenge Hammel's allegation that he is disabled within the meaning of the ADA.

Following discovery, Hammel and EGC each filed motions for summary judgment. After considering the respective

submissions and arguments, the court granted summary
judgment to Hammel in part on April 15, 2003, concluding
that Hammel had produced sufficient evidence to demon-
strate that his employer was motivated to discharge him
because of his disability, based on a statement from EGC's
owner, Buhlman, in his deposition. *See id.* at *19-20.[6] In
spite of the fact that the trial judge determined that Hammel
was discharged because of his disability, the judge found
that there was a genuine factual dispute as to whether
Hammel was a "qualified individual" under the ADA, and
reserved that issue for trial, along with the ultimate
question of whether EGC's termination of Hammel was in
violation of the ADA.

On June 6, 2003, EGC filed a motion under Fed. R. Civ. P.
59(e), requesting that the district court reconsider its
earlier partial summary judgment order in favor of the
plaintiff in which the court found that it was undisputed
that Hammel was terminated "because of" his disability.
EGC argued that evidence developed after the entry of the
summary judgment order in favor of Hammel would
"establish that [Hammel] was not terminated as a result of
his disability; [or] in the alternative was not terminated
solely as a result of his disability." Defendant's Trial Brief
and Brief in Support of Motion for Partial Reconsideration,
p. 3. Accordingly, EGC sought to proffer evidence of
Hammel's reckless behavior, refusal to follow job directions
and poor attitude in order to establish that even if discrimi-
natory intent had entered into the decision, Hammel would

---

[6] In his deposition testimony, Buhlman was asked why EGC
did not specifically discuss any safety issues with Hammel before
discharging him. Dep. of John Buhlman, at 23-24. In response,
Buhlman stated, "I don't know what good it would have done." *Id.*
Buhlman was then asked, "And why do you say that sir?" *Id.*
Buhlman answered, "Well I can't make him see. And that was the
problem." *Id.*

have been discharged due to his poor behavior alone and without regard to his vision problems. The trial judge denied EGC's motion on two separate grounds: (1) because it was untimely as filed, *i.e.*, it was filed only "two working days before the start of the trial"; and (2) because it "rested on evidence that should have been developed before [EGC] filed its motion for summary judgment." "Summary judgment is not a dress rehearsal or practice run; it 'is the put up or shut up moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of the events.' " *Id.* (quoting *Schacht v. Wisconsin Dept. Of Corr.*, 175 F.3d 497, 504 (7th Cir. 1999)).

Following the denial of EGC's Rule 59 motion, a two-day bench trial commenced. During the proceedings Hammel offered testimony concerning his perception of his work performance at EGC. Hammel stated that he felt physically capable of working as a general laborer at the cheese factory, and that none of his supervisors informed him of any problems with his job performance. However, Hammel did admit on cross-examination that he had been warned that he needed to be more careful when stacking and stamping the cheese wheels, and was told in no uncertain terms not to continue making personal phone calls on work time. Hammel, in support of his claims, also presented a vocational expert, Richard Davis, as a witness who proposed various accommodations that he believed EGC could have implemented that would have allowed Hammel to perform the essential functions of his job.

In response, EGC's owner, Buhlman, business manager Hemmy, and several of his supervisors and employees contradicted Hammel's testimony during the defense's case-in-chief by relating Hammel's record of insubordination, poor work attitude, reckless, careless and unsafe work habits,

and overall deficiencies in his work performance.[7] Specifically, Hammel's co-workers recounted their concerns over Hammel's failure to perform his job with the requisite care for their safety as well as his own. Robert Pelke testified that Hammel frequently ran into other people and equipment and that he acted in a reckless manner, especially when he was using the trimming knife, and went on to state that he had spoken with Anibas prior to Hammel's termination concerning Hammel's "recklessness and carelessness." *Id.* Steven Seller, another co-worker, stated that Hammel was usually "careless when he brought the soft cheese wheels to the work tables and tended to throw them down on the table," that he had "heard other employees complain about [Hammel] and his performance and [the] risks he posed," and opined that Hammel's carelessness in the factory "was [not] related to his visual impairment." *Id.* at *12. Another general laborer, Joseph Sabelko, testified that he attempted to assist Hammel with his performance problems, but whenever he attempted to explain how to properly perform a procedure, "such as trimming cheese, [Hammel] would turn away and refuse either to listen or to change his procedure." *Id.*

EGC also introduced evidence of Hammel's checkered employment history; details Hammel omitted when he filed a less than accurate and truthful work application upon seeking employment at the company. EGC's proffered evidence established that Hammel in his application had: (a) failed to account for a gap in his employment history while he was in an addiction program; (b) falsely claimed that a job he held at Sears was full-time while in reality it was part-time employment; and (c) listed his job at the Ability Building Center as lasting eleven months, when in fact he had worked there only six months. *Id.* at *16. The

---

[7] *See supra* at pp. 3-6.

defense also demonstrated that Hammel had, for obvious reasons, omitted a previous employer from his work history, Schlosser Lumber in Durand, Wisconsin; a job he held shortly before starting at EGC and left "after being criticized for not working and for failing to follow directions." *Id.* at *15. Hammel's supervisor at Schlosser, Michael Berger, testified that he found it difficult to work with him, and recounted that he repeatedly explained to Hammel how to perform his duties, but Hammel refused to cooperate. *Id.* at *16. For example, Berger explained that Hammel "was supposed to pile certain size boards in certain piles [but] failed to do [so] properly," and that when he was forced to criticize Hammel's performance, Hammel became "upset." *Id.* On one such occasion, Berger stated that Hammel "pulled out his false eye, showed it to Berger and told him, " 'You can't fire me, I'm disabled. I'll sue you.' " *Id.* at *16-17.

Following the close of testimony, both parties moved for judgment as a matter of law pursuant to Fed. R. Civ. P. 52(a). The trial judge, after considering the evidence and the law applicable thereto, granted EGC's motion concluding that Hammel *had failed to demonstrate that he was capable of "perform[ing] the essential tasks of the job in a way that met [EGC's] reasonable expectations," "with or without reasonable accommodation,"* and thus was *not a "qualified individual" with a disability as defined by the ADA. Id.* at *21-22 (emphasis added). In reaching this conclusion, the court reasoned that Hammel's "*difficulties with work that were not the result of his poor vision but were related to his poor attitude, his carelessness and his unwillingness to accept criticism and take direction," and the danger he posed to his own safety as well as that of his fellow employees provided evidence of his inability to perform the job. Id.* at *20-21 (emphasis added). Judge Crabb went on to state that "[e]ven if [Hammel] had been physically capable of performing the essential tasks of his job he was not a qualified

individual under the ADA because of his unwillingness to make the adaptations, take the care or exert the effort necessary to allow him to perform the essential elements of the job." *Id.* at *2. Accordingly, the court specifically concluded that EGC was not guilty of discrimination "against [Hammel] by firing him because it believed his disability prevented him from performing his job," and furthermore found that "although [EGC] failed to carry out its obligation to discuss possible accommodations with [Hammel, he] failed to show that there were any accommodations [his employer] could have made that would have enabled him to perform adequately. Without such a showing, the defendant is not liable for its failure to broach the issue of accommodations despite its knowledge of [Hammel's] disability." *Id.*

On appeal, Hammel argues that the court erred when it found his employer did not discriminate against him in violation of the ADA when terminating his employment and failing to provide accommodations for his disability. Hammel also contends that the court made several evidentiary errors that entitle him to a new trial. EGC cross-appeals, arguing that the court erroneously granted summary judgment to Hammel on the issue of whether EGC was motivated to terminate Hammel because of his disability.

## II.  Analysis

### A.  Hammel's Discriminatory-Discharge Claim

Since the defendant received the benefits of a complete bench trial and judgment our review is conducted pursuant to Fed. R. Civ. P. 52(a) "under which 'findings of fact shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge the credibility of the witnesses.'" *Cerros v. Steel Techs., Inc.*, 288 F.3d 1040, 1044 (7th Cir. 2002) (quoting *Anderson v. Bessemer City*, 470 U.S. 564, 573 (1985)). "[T]he question [of] whether intentional discrimination occurred itself calls

for a finding of fact, and thus the district court's decision on that point must be assessed under the clear error standard." *Id.* (citing *Pullman-Standard v. Swint*, 456 U.S. 273, 287 (1982)). We review the trial judge's legal conclusions *de novo. Id.*

**1.  The District Court's Consideration of "Non-Disability-Related Evidence"**

Hammel argues that the district court erred when it considered evidence of his poor attitude, careless behavior and deficient work performance in concluding that he was not a "qualified individual" capable of performing the job's "essential functions." Hammel claims that this so-called "non-disability-related evidence" of an individual's inability to perform up to an employer's expectations should not factor into the determination of whether or not an individual is a "qualified individual with a disability." We disagree.

The protections of the ADA extend only to "qualified individuals" with a disability. *Basith v. Cook County*, 241 F.3d 919, 927 (7th Cir. 2001). When determining whether a person is a "qualified individual" under the ADA, courts undertake a two-part inquiry and consider whether, at the time of the termination decision, the employee: 1) satisfies the employer's legitimate selection criterion for the job; and 2) is capable of performing the job's "essential functions" with or without reasonable accommodation from an employer. *Id.*; *Bay v. Cassens Transp. Co.*, 212 F.3d 969, 974 (7th Cir. 2000). Put differently, the ADA is designed to prevent discrimination against disabled persons who are otherwise qualified for a job, but as a result of a disability are unable perform the job's essential functions without reasonable accommodations. 29 C.F.R. Part 1630 Appendix § 1630.9; *see also Matthews v. Commonwealth Edison Co.*, 128 F.3d 1194, 1195 (7th Cir. 1997). However, the ADA does not shelter disabled individuals from adverse employment

actions if the individual, <u>for reasons unrelated to his disability</u> (such as a poor work ethic, carelessness, bad attitude, insubordination or unprofessional demeanor), is <u>not qualified</u> for the job or is <u>unable to perform</u> the job's essential functions or fulfill the requirements of the position as prescribed by the employer or "fails to meet his employer's expectations." *See, e.g.*, *Williams v. United Ins. Co. of America*, 253 F.3d 280, 282 (7th Cir. 2001); *Tyler v. Ispat Inland Co.*, 245 F.3d 969, 972 (7th Cir. 2001); *McPhaul v. Bd. of Comm'rs*, 226 F.3d 558, 563-64 (7th Cir. 2000); *Gorbitz v. Corvilla, Inc.*, 196 F.3d 879, 882 (7th Cir. 1999); *DePaoli v. Abbott Lab.*, 140 F.3d 668, 674 (7th Cir. 1998); *Leffel v. Valley Fin. Serv.*, 113 F.3d 787, 794-95 (7th Cir. 1997); *Siefken v. Vill. of Arlington Heights*, 65 F.3d 664, 667 (7th Cir. 1995).

EGC, as an employer, is certainly entitled to expect its workers, disabled or otherwise, to use care and caution in the workplace and to adhere to factory-wide safety policies and requirements, as well as directives. *See EEOC v. Exxon Corp.*, 203 F.3d 871, 875 (5th Cir. 2000); *EEOC v. Amego, Inc.*, 110 F.3d 135, 143 (1st Cir. 1997). As noted above, Hammel was often careless, such as when he slammed the 30-pound cheese forms on his work table posing a risk of injury to someone's hand or foot, bumped into his co-workers and spilled brine on them, crashed a pallet of cheese wheels into a wall while operating a pallet jack, and stuck his hands in a cheese grinder after being repeatedly warned of the danger. This pattern of hazardous and reckless behavior jeopardized Hammel's safety, as well as that of his fellow workers. The fact that Hammel repeatedly saw fit to disregard the safety and operational rules at EGC, which were enacted to protect the workers from the dangers of suffering injuries inherent in a busy, fast-moving factory setting is obviously eminently relevant to a determination of whether he can measure up to the requirements of his position. *See Exxon Corp.*, 203 F.3d at 875.

The ADA also does not require that EGC, or any employer, condone or accept irresponsible behavior from an employee who, like Hammel, despite repeated warnings failed to follow or comply with company rules and policies and continued to make personal phone calls on work time and take unauthorized cigarette breaks. Nor does it protect an employee who is insubordinate and refuses to obey and accept direct orders from his supervisors—including but not limited to instructing him to get back to work in addition to creating a direct safety hazard to himself and fellow colleagues. *See Reed v. LePage Bakeries, Inc.*, 244 F.3d 254, 262 (1st Cir. 2002). Moreover, the ADA provides no protection for a disabled worker who, like Hammel, for reasons unrelated to his disability performs in such an unsatisfactory manner (whether it be for reasons of carelessness, insubordination or obstinance) that he fails to keep up with the production pace and abide by the quality-control standards that EGC has established as a benchmark for all its employees. *See Hoffman v. Caterpillar, Inc.*, 256 F.3d 568, 573 (7th Cir. 2001); *Hedberg v. Indiana Bell Tel. Co.*, 47 F.3d 928 (7th Cir. 1995); *Mason v. Avaya Communications, Inc.*, 357 F.3d 1114, 1121 (10th Cir. 2004); *Calef v. Gillette Co.*, 322 F.3d 75, 86 n.8 (1st Cir. 2003). We are convinced that the court did not commit error when it considered evidence of Hammel's careless behavior, poor attitude, insubordination, and deficient work performance when considering whether he was a qualified individual within the meaning the ADA.[8]

---

[8] Given our discussion on this issue, we need not address Hammel's related argument that evidence of his poor attitude, careless behavior and deficient work performance was relevant only to an inquiry into EGC's reasons for terminating him. As we have discussed, consideration of this evidence was proper as part of the court's inquiry into whether he was capable of performing the essential functions of the job in manner that met EGC's legitimate business expectations.

## 2.  The Court's "Qualified Individual" Analysis

Hammel next asserts that the court erred in determining that there were no reasonable accommodations that EGC could have implemented that would have allowed him to perform the "essential functions" of his job at the cheese factory. As noted above, "[*u*]*nder the ADA, the employer avoids all liability if the plaintiff would have been fired because incapable of performing the essential functions of the job, and the burden of proof on the issue of capability is not on the employer but on the plaintiff.*" *Miller v. Illinois Dep't of Corr.*, 107 F.3d 483, 484 (7th Cir. 1997) (emphasis added). This is because the "provisions of the ADA relating to employment protect only a 'qualified individual,' 42 U.S.C. § 12112; that is one who with or without a reasonable accommodation by the employer can perform the essential functions of the job." *Id.* at 485. Thus, it is Hammel's burden to *"supply evidence sufficient [that would] allow a jury" to conclude that reasonable accommodations could or should have been fashioned that would have allowed him to perform the duties of a general laborer in a manner that would meet or exceed EGC's legitimate expectations and satisfy the essential functions of that position. McPhaul*, 226 F.3d at 563 (emphasis added).

###   i.   Hammel's Job Performance Problems Unrelated to His Disability

At the outset, we note that throughout the course of his employment Hammel displayed a number of most troubling work habits that had nothing to do with his disability. Hammel repeatedly took unauthorized work breaks and engaged in making personal telephone calls on work time. In addition, without permission Hammel would walk outside the factory for cigarette breaks while he was on duty. Hammel also exhibited insubordinate, arrogant and obstinate behavior—unrelated to his vision impairment—when

he mocked Smith after being told to get back to work following another unauthorized cigarette break as well as when he refused to cease and desist operating the cheese grinder after he was reprimanded for repeatedly placing his hands on and inside of the dangerous machinery while in operation. The disregard Hammel exhibited for the direct orders he was given and his demonstrated lack of respect for his supervisor's directions evince a troubled, confused and unsuitable employee, not a disabled one. Many of the reckless acts Hammel was guilty of committing in the factory bore no connection to his vision disability, but rather to his insubordinate makeup and nature. For example, Hammel negligently operated an electric pallet jack, which on at least one occasion crashed into a wall, ruining a pallet of cheese wheels (which Hammel shrugged off and laughed about immediately after the incident). In addition, Hammel had a tendency to slam the 30-pound cheese wheels onto the work table, rather than carefully place them as instructed; a practice which distracted and endangered his fellow employees and damaged the cheese product. Hammel cannot reasonably claim that such irresponsible and reckless conduct was the result of his diminished sight. These were serious employment infractions and no employer should be required to accept much less ignore or condone this type of irresponsible conduct simply because the employee acting out also happens to be suffering from a disability within the meaning of the ADA.

Due to Hammel's careless attitude and inability to perform the tasks assigned to him, EGC was certainly justified in discharging him based solely on his behavior and attitude, without regard to his disability. However, unfortunately for EGC, the company made Hammel's disability an issue and without doubt spurred this litigation when, in an attempt to protect him from the real truth of his discharge, they informed Hammel that he was being terminated, not because he was an undesirable employee with serious at-

titudinal problems, but because his vision impairment "interfered 'to some extent' with his work and caused [EGC] concern for his own safety and the safety of his coworkers," a mistake Buhlman acknowledged in deposition testimony prior to trial. *Id.* at *19. The district court reasoned that these statements were sufficient to demonstrate that EGC had discharged Hammel because of his disability. However, notwithstanding this determination, the judge ruled post-trial that the reasons EGC had given when terminating Hammel were irrelevant because Hammel failed at trial to demonstrate that he was capable of performing the essential functions of the job in manner that met EGC's legitimate business expectations, with or without accommodation. We agree.

Hammel has not argued, nor could he argue that the improper motivations of the decision makers at EGC alone entitle him to relief pursuant to the ADA. *For it is well established that "[u]nder the ADA, the employer avoids all liability if the plaintiff would have been fired because incapable of performing the essential functions of the job."* *Miller*, 107 F.3d at 484 (emphasis added). Employment decisions motivated by an improper or discriminatory animus are violative of the ADA, but however improper, the ADA only protects "qualified individuals"; those who can perform the essential functions of their job with or without reasonable accommodations. *Id.* at 485. Thus, it is Hammel's burden to establish either: (a) that he could perform the essential functions of his job without accommodation; or (b) that reasonable accommodations were available and could have been implemented to allow him to perform the essential functions of his job.

### ii.  Hammel's Inability to Perform the Job without Accommodation

Hammel had significant difficulties while attempting to perform the essential duties of a general laborer at the

cheese factory. Further demonstrating Hammel's inability to perform the functions of his job in anywhere near a workmanlike manner was his inability to properly stamp the cheese wheels, and his likewise incapability of correctly forming, stacking, transporting the finished cheese product, and/or flipping the product, all essential to EGC's business. *See supra* pp. 3-6. This is not to mention the risk of injury that Hammel posed to his co-workers by spilling brine, tripping over hoses, and bumping into presses, walls, and fellow workers, some of which were undoubtedly caused by his patent carelessness. *See id.* Whether Hammel had problems performing his duties at EGC resulting from his disability or poor attitude is unimportant; however, what is germane, and is apparent from the record, is the fact that Hammel was unable to perform the essential functions of his job and meet the expectations of his employer.

We agree with the trial judge's conclusion that "*it is irrelevant . . . whether it was [Hammel's] vision impairment or his refusal to take the proper care that caused him to bump into his co-workers or the equipment, to run pallets into the wall, or fail to turn and stack the cheese properly or to slam the cheese down on the table . . . [for] [w]hatever the cause he has demonstrated his inability to perform the essential tasks of the job . . . [and is] not a qualified individual within the meaning of the [ADA].*" *Hammel*, 2003 U.S. Dist. LEXIS 11380, at *22-24 (emphasis added). As this court has made clear on a number of occasions, when the evidence demonstrates that an employee is incapable of performing the job, *the employer need not isolate the disability-related causes for an employee's inferior performance from problems that stem from a poor attitude, insubordination, carelessness, or outright disregard for the safety of himself and his co-workers. See, e.g., Waggoner v. Olin Corp.*, 169 F.3d 481, 484-85 (7th Cir. 1999); *Palmer v. Circuit Court*, 117 F.3d 351, 352 (7th Cir. 1997); *Siefken*, 65 F.3d at 667. Instead, an employer is entitled to conclude that termi-

nation is warranted solely on the basis of the employee's patent inability to perform his job in manner that meets the essential requirements of that position. This is true even if, after further inquiry, an employer determines that the employee's inability to perform the job "is due entirely to a disability." *Matthews*, 128 F.3d at 1195; *see also Palmer*, 117 F.3d at 352; *Miller*, 107 F.3d at 484-85. *Either way, an employer is only in violation of the ADA if a terminated employee can establish that reasonable accommodations exist that would have enabled that person to perform the essential functions of his or her job. See Miller*, 107 F.3d at 485-86. As demonstrated below, Hammel failed to put forth any such accommodations and thus cannot prevail.

### iii. Hammel's Failure to Demonstrate Reasonable Accommodations

At trial Hammel's vocational expert, Richard Davis, recommended that EGC could have implemented some questionable "accommodations" that he believed would have enabled Hammel to perform the essential functions of a general laborer. Among these proposed "accommodations" were four that involved Hammel's use of "adaptive techniques" that he had previously been trained to utilize during periods of training at "Blind Incorporated" (a vocational training school) prior to his employment at EGC such as using: 1) a "feel" technique to help him properly stack the cheese wheels; 2) a "flipping" technique to ensure that the cheese wheels were flipped and turned correctly; 3) a "foot-shuffling" technique to avoid tripping; and 4) a technique which had him intentionally bump into and feel objects in order to understand physical space. However, Hammel needed no "accommodation" from EGC to make use of these adaptive techniques.

"Reasonable accommodations" under the ADA are defined in part as "modifications or adjustments *to the work environment* [by the employer]. . . *that enable* a[n] . . . individual

with a disability to perform the essential functions" of a position. 29 C.F.R. § 1630.2(o) (emphasis added). These "adaptive techniques" are skills and know-how that Hammel stated that he had been trained to incorporate into his work routine prior to his employment with EGC. They are not "modifications or adjustments *to the work environment* [by the employer]. . . that enable" him to perform the job's essential functions. Instead, Hammel's proposed "adaptive techniques" were nothing more than "modifications" or "adjustments" to his own work performance that he was expected to utilize without prodding or "accommodation" from his employer. *Cf. Sutton v. United Air Lines, Inc.*, 527 U.S. 471, 482 (1999) ("[I]f a person is taking measures to correct for, or mitigate, a physical or mental impairment, the effects of those measures . . . must be taken into account when judging [a disability]."); *Seifken*, 65 F.3d at 667. Thus, we agree with the trial judge's determination that these "adaptive techniques" were not "reasonable accommodations" within the meaning of the ADA.

Davis proposed additional accommodations that, in his opinion, EGC supposedly could have undertaken to facilitate Hammel's performance of some of the job's essential functions. Among these "proposed accommodations,"[9] Davis suggested that Hammel could learn to stamp the cheese wheels correctly by having a "co-worker check on [his]

---

[9] Davis also proposed that EGC could provide Hammel with formal job training, even though EGC does not and has not in the past provided any of its new employees with any different training than Hammel received when he started the job. As stated *infra*, this is not a reasonable accommodation under the ADA, as the ADA "does not require employers to offer special training to disabled employees." *Williams*, 253 F.3d at 282. In addition, Davis suggested EGC could allow Hammel to use a manual rather than an electric pallet jack to move the pallets of cheese wheels. This proposed accommodation does not account for potential slowdowns in the production pace Hammel's use of a manual pallet jack could cause. *See Hoffman*, 256 F.3d at 573.

stamping and teach him how to hold the stamp to make sure that it printed." *Hammel*, 2003 U.S. Dist. LEXIS 11380, at *15. As the trial judge properly determined, this is not a reasonable accommodation under the ADA. The courts have been reticent, as they should be, to require employers to provide accommodations that necessitate the enlistment of another employee to assist an ADA claimant in performing the essential functions of his job. *Id.* at *26 (citing *Peters v. City of Mauston*, 311 F.3d 835, 845-46 (7th Cir. 2002)). To be sure, the ADA does not require an employer to accommodate a disabled employee by making special, individualized training or supervision available in order to shepherd that employee through what is an essential and legitimate requirement of the job. *Williams*, 253 F.3d at 282 ("the employer is not required to give the disabled employee preferential treatment, as by giving her a job for which another employee is better qualified, or by waving his normal requirements for the job in question"); *Sieberns v. Wal-Mart Stores, Inc.*, 125 F.3d 1019, 1022 (7th Cir. 1997). In this regard, let us make clear that the ADA "is not an affirmative action statute in the sense of requiring an employer to give preferential treatment to a disabled employee merely on account of the employee's disability," *see Williams*, 253 F.3d at 282, although it does provide disabled persons an opportunity to work assuming accommodations exist which allow them to perform a job as would any other employee. Accommodations which require special dispensations and preferential treatment are not reasonable under the ADA, thus Davis's recommendation that Hammel be given special training and provided with a person to "check" up on him does not qualify as a reasonable accommodation.

Davis also proposed that Hammel and his fellow EGC laborers could employ "verbal cues" to avoid bumping into each other. However, we are of the opinion that it borders on the absurd to even suggest implementing a measure of

this nature in a factory setting of this type. The particular work environment at EGC is excessively noisy and many employees, out of necessity, are found to wear earplugs while performing their duties. Because he would be unable to hear them due to the excessive noise level, it is antithetical and unreasonable to propose that based on verbal cues Hammel could be prevented from colliding with walls, equipment and other employees near the production line on the busy work floor.

What's more, Hammel's proffered accommodations address only a small portion of EGC's legitimate concerns with Hammel's careless, unacceptable work performance, such as his inability to legibly stamp the cheese wheels, avoid collisions with machines and other employees and a myriad of other problems. More importantly, these proposed measures do not address Hammel's inability to perform a significant number of his *essential* assignments, duties and responsibilities at EGC, such as forming, stacking, and flipping the cheeses. In *Miller v. Illinois Dept. of Corrections*, this court addressed a similar situation in which a woman who had suffered injuries in a car accident, resulting in an almost complete loss of vision, was discharged from her position as a prison guard. *Miller*, 107 F.3d at 484. Allegedly, she was told by the warden that she was being fired because "there was no way a blind person would ever work in his Prison." *Id.* We upheld the district court's conclusion that the guard was not a "qualified person" within the meaning of the ADA, regardless of the allegedly distasteful and irrational motivation behind her termination, because there was no way that she could perform the essential duties of a corrections officer. *Id.* at 485. In coming to this conclusion we found persuasive evidence that, even with accommodations, this woman could fulfill only two out of over ten job requirements of the position. *Id.* In turn we rejected her contention that she should have been allowed to rotate between the two functions which she could perform because "the reason for

having multiple able workers who rotate through the different positions is to be able to respond to unexpected surges in the demand for particular abilities." *Id.* Because Miller was unable to perform the duties of her position as a correctional officer and the prison officials could not offer her reasonable accommodations that would allow her to fulfill those duties, we held that she was not entitled to the protections of the ADA. *Id.*

As was the situation in *Miller*, Hammel and his vocational expert failed to recommend to this court reasonable accommodations that would allow him to perform the essential duties required for employment as a laborer at EGC. *Id.* In addition, Hammel was an insubordinate, reckless, and thus undesirable employee, and we agree with the trial judge's conclusion that "*[n]o accommodation would make a difference for an employee unwilling to exercise care, accept instruction or take responsibility for getting his work done properly.*" *Hammel*, 2003 U.S. Dist. LEXIS 11380, at *27 (emphasis added). Also, we agree with the district court's conclusion that Hammel is not a "qualified individual" with a disability under the ADA, and thus is not entitled to the protections thereof. *Basith*, 241 F.3d at 927; *Bay*, 212 F.3d at 973; *DePaoli*, 140 F.3d at 674. As Judge Crabb noted, perhaps "[EGC's] business manager should have told [Hammel] exactly why he was being fired rather than try to sugar coat the news . . . . [but this] failing [does not] make [EGC] liable to [Hammel] under the ADA." *Hammel*, 2003 U.S. Dist. LEXIS 11380, at *28. The district court did not commit clear error in concluding that EGC did not discriminate against Hammel because of his disability when it terminated him.[10]

---

[10] Because Hammel failed to demonstrate the existence of a reasonable accommodation and because Hammel is not a "qualified individual" under the ADA, we need not address his argument
(continued...)

### B. Alleged Evidentiary Errors by the District Court

Hammel also argues that he is entitled to a new trial because the district court allegedly made evidentiary errors when: 1) restricting the testimony of his vocational expert; and 2) admitting for impeachment purposes evidence of a cash gift he received from his father after leaving EGC and the testimony of one of his former employers on the subject of his poor attitude and work ethic. We review alleged evidentiary errors under the abuse of discretion standard, and will reverse only if the trial judge's ruling was erroneous and the error affected the outcome of the case. *Cooper-Schut v. Visteon Auto Sys.*, 361 F.3d 421, 429 (7th Cir. 2004).

### 1. Hammel's Expert Witness Report

Hammel contends that the trial judge improperly restricted the testimony of his vocational expert, Richard Davis. The judge restricted Davis from testifying to the opinions set forth in his expert witness report because Hammel failed to timely disclose the report to EGC prior to trial as required by Fed. R. Civ. P. 26(a)(2). The court accordingly limited Davis's testimony to those assertions that had been disclosed in a timely-filed affidavit attached to Hammel's motion for summary judgment.

---

[10] (...continued)
that EGC should be liable for failing to accommodate his disability by not engaging in an "interactive process" to determine if any reasonable accommodations existed. *Mays v. Principi*, 301 F.3d 866, 871 (7th Cir. 2002); *see also Bombard v. Fort Wayne Newspapers, Inc.*, 92 F.3d 560, 563-64 (7th Cir. 1996). We note only that EGC did attempt to accommodate Hammel, by shifting his duties and keeping him exclusively in the "make room." *See Hammel*, 2003 U.S. Dist. LEXIS 11380, at *26.

The Federal Rules of Civil Procedure require that an expert's report be disclosed "at least 90 days before the trial date" in order for a party to make use of the report at trial. Fed. R. Civ. P. 26(a)(2)(C); *Miller v. Pfizer, Inc.*, 356 F.3d 1326, 1332 (10th Cir. 2004). The sanction for failing to comply with Rule 26(a)(2)(C) is "automatic and mandatory" exclusion from trial of the non-disclosed evidence under Fed. R. Civ. P. 37(c)(1) "unless non-disclosure was justified or harmless." *Musser v. Gentiva Health Servs.*, 356 F.3d 751, 758 (7th Cir. 2004). Hammel failed to disclose his expert witness's report before trial and thus failed to comply with Rule 26(a)(2)(C) and has failed to offer any explanation as to why he did not make the report available to EGC. In addition, Hammel has failed to offer any argument as to why his failure to produce the report should be considered harmless. Accordingly, we are of the opinion that the trial court's exclusion of Davis's testimony as to his opinions on the report was the proper sanction in light of Hammel's failure to comply with Rule 26(a)(2)(C), and based on the record we also conclude that the court did not abuse its discretion in imposing this sanction. *Musser*, 356 F.3d at 758.

### 2. EGC's Impeachment Evidence

Hammel next argues that the district court erred in its decision to admit evidence that EGC failed to disclose prior to trial: 1) evidence of a cash gift he received after leaving EGC; and 2) testimony of one of his former employers on the subject of his poor attitude and work ethic. At trial, EGC sought to enter both forms of evidence to impeach statements Hammel made on cross-examination. Hammel timely objected to admission of the evidence, arguing that EGC failed to disclose prior to trial that it intended to offer either evidence of the cash gift or the testimony by Hammel's former employer. *See* Fed. R. Civ. P. 26(a)(3). Finding that the evidence was intended for impeachment purposes only, the district court concluded that EGC was not required to

disclose the evidence prior to trial and properly allowed EGC to present it.

In accordance with Fed. R. Civ. P. 26 (a)(1)(A) & (3), evidence offered "solely for impeachment purposes" does not have to be disclosed prior to trial. *See Musser*, 356 F.3d at 756; *DeBiasio v. Illinois Cent. R.R.*, 52 F.3d 678, 688 (7th Cir. 1995).[11] EGC offered evidence of a cash gift Hammel received from his father when exploring the issue of whether Hammel had received payment from any collateral sources following his termination which could serve to offset his request for an award of back pay from EGC.[12] *See Flowers v. Komatsu Mining Sys., Inc.*, 165 F.3d 554, 558 (7th Cir. 1999). Hammel was asked on cross-examination if, after his termination, he was "given any money even as a gift in exchange for staying with his father," and he answered that he had not. To impeach Hammel's answer, EGC offered evidence of the $5,000 cash gift that Hammel received after caring for his father: a $5,000 check and an accompanying transaction statement referencing the check and containing the notation "[t]his money was given to Paul [Hammel] as [a] gift for taking care of Dad since last Nov." Evidence of the cash gift that Hammel received directly contradicted his statement that he had not received such a gift.

We also conclude that the court did not abuse its discretion when allowing EGC to present testimony from Hammel's former employer on the subject of his poor attitude and work ethic. On cross examination, EGC asked Hammel a

---

[11] Hammel also contends that EGC should have disclosed evidence of the cash gift in response to a properly propounded discovery request. *See Varga v. Rockwell Int'l Corp.*, 242 F.3d 693, 697 (6th Cir. 2001). Hammel, however, failed to produce any such discovery request during the trial.

[12] As a damage remedy, Hammel's requested back pay from the time of termination, lost future wages and benefits, and compensatory and punitive damages.

series of questions concerning many aspects of his period of employment at Schlosser Lumber in Durand, Wisconsin, the job he held immediately prior to his employment at EGC. Specifically, Hammel was asked if, while at Schlosser, he: 1) was told that he was not "doing [his] job correctly"; 2) "threatened the individuals at Schlosser Lumber with a disability lawsuit if they fired [him]"; and 3) had walked off the job and told his supervisor to "go to hell." Hammel answered "no" to all three questions. To impeach Hammel's answers to these questions, EGC introduced testimony from Michael Berger, Hammel's supervisor at Schlosser Lumber. EGC first queried Berger as to whether he "ever [told] Mr. Hammel that he had done [his] job incorrectly?" Berger's response was: "Yes, I did." EGC next asked Berger if Hammel "ever threaten[ed] to sue?" Berger's answer to this question was: "Yes, he did . . . . he said 'I'll sue you if you fire me.'" Subsequently, EGC inquired as to how "Hammel's employment came to an end at Schlosser Lumber?" Berger's reply was: "One day he was . . . . more or less standing there, and I told him, Get working . . . . and he went and got all pissed off and called me a bunch of names and called me a lot of things, and he walked off." Berger's testimony as to these matters directly contradicted Hammel's representations and suggests a lack of honesty; for Hammel claimed that, while employed at Schlosser Lumber, he was never told he was doing his job incorrectly, he never threatened to file a lawsuit if terminated, and he never walked off the job in the wake of a profanity-laced tirade. Berger's testimony thus served to impeach Hammel's credibility as a witness. Accordingly, we hold that the district court did not abuse its discretion in admitting Berger's testimony for impeachment purposes, even though EGC failed to disclose Berger as a witness before the trial.[13] *See DeBiasio,* 52 F.3d at 688.

---

[13] Hammel contends that EGC violated the spirit of Fed. R. Civ. P. 26 because it "intended to use" Berger's testimony for purposes

(continued...)

### C.  EGC's Cross Appeal

In their conditional cross-appeal, EGC urges this court to reverse the trial court's grant of summary judgment in Hammel's favor on the issue of whether Hammel was terminated on the basis of his disability. However, because we have resolved this case in EGC's favor, and uphold the trial court's subsequent judgment as a matter of law for EGC, we need not address the cross-appeal. *See Mathias v. Accor Economy Lodging, Inc.*, 347 F.3d 672, 674 (7th Cir. 2003).

## III.  Conclusion

The decision of the district court is

AFFIRMED.

A true Copy:

   Teste:

_____
*Clerk of the United States Court of
Appeals for the Seventh Circuit*

---

[13] (...continued)
other than impeachment. Hammel fails to develop any argument in support of this contention, so we need not address whether Berger's testimony was used for both impeachment and substantive purposes, a scenario which may not be covered by the exception to the discovery requirements of Fed. R. Civ. P. 26 that we have applied herein. *Compare DeBiasio*, 52 F.3d at 686 *with Wilson v. AM General Corp.*, 167 F.3d 1114, 1122 (7th Cir. 1999); *see also Klonoski v. Mahlab*, 156 F.3d 255, 270 (1st Cir. 1998).

---