In the

# United States Court of Appeals
## For the Seventh Circuit

No. 23-2825

SARAH SCHOPER,

*Plaintiff-Appellant,*

*v.*

BOARD OF TRUSTEES OF WESTERN ILLINOIS UNIVERSITY,

*Defendant-Appellee.*

Appeal from the United States District Court for the
Central District of Illinois.
No. 4:20-cv-04232 — **Sara Darrow**, *Chief Judge.*

ARGUED SEPTEMBER 5, 2024 — DECIDED OCTOBER 17, 2024

Before EASTERBROOK, KIRSCH, and KOLAR, *Circuit Judges.*

KOLAR, *Circuit Judge.* In January 2015, Plaintiff-Appellant Sarah Schoper suffered a traumatic brain injury. At the time of her injury, Schoper worked as a tenure-track assistant professor at Defendant-Appellee Western Illinois University. After the University denied her tenure application in 2017, Schoper filed suit, asserting claims of disability discrimination and failure to accommodate in violation of the Americans with Disabilities Act, 42 U.S.C. § 12101 et seq. The district

court granted summary judgment in favor of the University on both claims. We affirm.

## I.    Background

On January 6, 2015, Sarah Schoper suffered a life-threatening pulmonary embolism that caused a traumatic brain injury. Schoper spent 46 days in the hospital. Because of the severity of the illness, she developed high-functioning mild aphasia—a condition that causes difficulty in retrieving words—as well as other physical disabilities.

After her injury, Schoper's neurologist told her that complex intellectual activities would hasten her recovery. Thus, Schoper sought to return to teaching as quickly as possible, and her doctor indicated that she was healthy enough to return to work on May 28, 2015. The University provided her with physical accommodations, and, on her neurologist's recommendations, allowed her to teach the same courses she had previously taught and to refrain from serving on University committees.

Before and after her injury, Schoper continued to work towards tenure at the University. A collective bargaining agreement between the faculty union and the University governed the tenure process generally but each Department could add specific criteria for evaluating applications. Tenure-track faculty received retention evaluations during their first five years at the University. In their sixth year, faculty could apply for tenure. The collective bargaining agreement contained a "stop-the-clock" provision that allowed an individual to request an extra year to apply for tenure due to significant illness. This meant that an applicant could apply for tenure in her seventh year. To take advantage of this provision, an

individual had to request the extension before the tenure application due date in year six.

The University's process for evaluating tenure applications was multistep. First, a committee made up of Departmental peers reviewed each application and made a recommendation to the Department chair and the Department dean. The chair and dean then made independent recommendations. If anyone—committee, dean, or chair—recommended that the application be denied, two additional committees (the College Personnel Committee and the University Personnel Committee) reviewed the application and issued recommendations. After these steps, the University President, the Academic Vice President, and the Provost all reviewed the application and decided whether to recommend the applicant for tenure before the Board of Trustees. Candidates not recommended for tenure were issued a terminal contract for the following year.

Reviewers analyzed candidates' contributions in three categories: (1) teaching and primary duties, (2) professional activities, like published scholarship, and (3) service, such as committee assignments. Primarily at issue here is the first requirement, teaching. In that category, Schoper's department, the Department of Educational Studies, listed five criteria for evaluating a candidate: (1) English proficiency; (2) peer and chair evaluations; (3) student evaluations; (4) syllabi; and (5) primary duties assigned by the chair.

In Schoper's case, students completed anonymous evaluations at the end of each of her courses. The evaluations had two parts. In Part A, students signaled agreement or disagreement on a scale of one to five with a list of statements. The Department averaged these scores; a higher average score

was better. In Part B, students provided qualitative feedback in the form of written comments.

The Department preferred Part A averages above 4.0 for tenure candidates, although it instructed those reviewing tenure applications to consider other performance indicators in addition to the Part A scores. This was consistent with the collective bargaining agreement, which stated that reviewers should consider more than the numerical scores. The collective bargaining agreement also instructed reviewers to look for patterns in scores, rather than rendering decisions based on outlier scores given the full context of an applicant's teaching history. Before her injury, Schoper's Part A scores stayed above a 4.0.

When Schoper returned to work in 2015, she was a fifth-year assistant professor and her Department committee approved her retention for a sixth year. In the fall of 2015, Schoper met with a member of the Department committee, who asked Schoper if she had considered taking time off. Schoper viewed taking time off as equivalent to medical leave and believed that doing so would be inconsistent with her neurologist's instructions to return to work. The interaction disturbed Schoper and she eventually reported it to the Department chair, who told her to follow her neurologist's advice.

In late October, the Department chair approached Schoper and told her that students had begun complaining about Schoper's teaching skills. The Department chair told Schoper that she believed the students were being unfair. But Schoper knew that her disability affected her teaching. She could no longer see the left side of the classroom, so students were required to raise their hands before speaking. She also struggled

to read non-verbal cues and track discussions, so she deliberately slowed the pace of class and began writing out an agenda on the dry erase board to stay on task. This slowing also applied to responding to student requests to change certain assignments. Students reacted differently to these changes: some appreciated the structure, while others found that it stifled the discussions. When the Department chair observed one of Schoper's classes that semester, she nonetheless gave Schoper superior ratings.

At no point did Schoper request to stop her tenure clock. She did not know the procedure existed and believed that her options were to take a leave of absence or continue teaching. She did not discuss the stop-the-clock option with anyone in her Department, and the Provost's office informed her that there was no reason not to move forward with her tenure application if it met the requirements.

In January 2016, Schoper received her Part A scores for Fall 2015, her first semester teaching in-person following her injury. Her average Part A score had dropped dramatically to a 3.8. In Fall 2014, that score had been a 4.6. And, for the first time in her teaching career, students left negative comments in Part B of their evaluations.

Schoper met with the new interim Department chair a few days later to discuss the evaluations. Schoper told the chair that she felt that the students were reacting poorly to her disabilities and had potentially made discriminatory comments. According to Schoper, one student described Schoper as a "weed that needed to be plucked." Another compared her abilities to a preschooler, while some others suggested that she was "not the teacher [she] used to be and that [she] needed more time to recover." The interim Department chair

told Schoper that she would need to make some adjustments in response to the feedback, and Schoper did not bring up the student comments again.

In January 2017, Schoper submitted her application for tenure to the Department committee. That same month, the committee recommended that Schoper not receive tenure based on her teaching scores. In particular, the committee noted that Schoper's average score for seven of her ten most recent courses fell below the recommended 4.0 threshold, instead averaging between a 3.14 and 3.78.

The Department committee also looked at the Part B comments from Schoper's recent courses and found them troubling. The representative comments stated that Schoper had favorites in class and graded based on personal preference; that she focused too much on getting her students to like her; that she did not know how to take feedback; made class feel like a waste of time; and that she would regularly complain about not having tenure and bad-mouth other teachers. The committee noted other positive student comments, as well as positive faculty (both peer and chair) review, but unanimously concluded that Schoper did not meet the requirements for tenure.

Schoper requested reconsideration, pointing out that her average Part A score over five years was 4.26. For the first time, she also raised the issue of her disability, acknowledging that it currently impacted her teaching but stating that those impacts should—based on her neurologist's analysis—lessen with time. In her reconsideration packet, Schoper included a letter from her neurologist recommending that she be reconsidered for tenure and allowed to continue to work.

The Department committee unanimously affirmed its decision.

The Department chair reached a similar conclusion upon reviewing Schoper's application and recommended that she not be awarded tenure. He based this decision on her poor teaching evaluations in year six, during which her Part A average remained under 4.0. Schoper again requested reconsideration, but the chair affirmed his decision, finding that Schoper had fallen short of the required criteria. At this point, Schoper asked for more time to achieve tenure, but the Department chair noted that he simply did not have the power to grant that request under the collective bargaining agreement. His only suggestion was to investigate long-term disability benefits.

Schoper's application continued to make its way through the process. The College Personnel Committee recommended denying tenure on the same bases as the Department committee and the Department chair: Schoper's teaching evaluations did not meet expectations. Schoper's request for reconsideration did not change the College Personnel Committee's decision either. The University Personnel Committee, on the other hand, recommended that Schoper receive tenure. The committee emphasized that the evaluation period covered Schoper's average scores for her entire time at the University and cautioned against giving the most recent scores undue weight. At this point, the negative recommendations outnumbered the positive ones three to one.

The Dean and the President of the University agreed with the Department committee, the Department chair, and the College Personnel Committee. Neither recommended

Schoper for tenure. The University therefore issued Schoper a terminal contract.

Schoper then filed this suit alleging that the University discriminated against her on the basis of her disability and failed to offer her reasonable accommodations in violation of the Americans with Disabilities Act, 42 U.S.C. §§ 12101–213. At summary judgment, the district court ruled in favor of the University. The district court found that Schoper could not demonstrate that a genuine dispute of material fact existed as to whether her disability was the but-for cause of her negative tenure recommendation. As for Schoper's failure-to-accommodate claim, the district court found that Schoper had failed to show how her preferred accommodations—a delay in considering her tenure application—would allow her to perform the essential functions of her position. Schoper appealed.

## II.    Analysis

We review the district court's summary judgment decision de novo, construing the evidence and taking all inferences in the non-moving party's favor. *Pain Ctr. of SE Ind. LLC v. Origin Healthcare Sols. LLC*, 893 F.3d 454, 459 (7th Cir. 2018). We may affirm "on any ground supported by the record as long as it was adequately addressed in the district court and the losing party had an opportunity to contest it." *EEOC v. Wal-Mart Stores E., L.P.*, 46 F.4th 587, 593 (7th Cir. 2022).

### A.  Failure to Accommodate

Schoper urges us to reverse the district court's grant of summary judgment to the University on her failure-to-accommodate claim. "[T]o establish a claim for failure to accommodate, a plaintiff must show that: (1) [s]he is a qualified individual with a disability; (2) the employer was

aware of her disability; and (3) the employer failed to reasonably accommodate the disability." *Bunn v. Khoury Enters., Inc.*, 753 F.3d 676, 682 (7th Cir. 2014) (citation omitted).

Schoper's falling Part A scores and the bearing that had on her tenure decision belie a fundamental problem with her case: the impact that her disability had on whether she was a qualified individual. *See Li v. Fresenius Kabi USA, LLC*, 110 F.4th 988, 995 (7th Cir. 2024) (failure-to-accommodate claims require that individuals are "qualified"). To determine whether an individual is qualified, we first evaluate "whether the individual satisfies the necessary prerequisites of the position" before considering "whether the individual can perform the essential functions of the position with or without a reasonable accommodation." *Leibas v. Dart*, 108 F.4th 1021, 1025 (7th Cir. 2024).

The University's tenure policy states that reviewers preferred Part A scores above 4.0. Before her injury, Schoper was a superior teacher. Her Part A scores exceeded the recommended minimum threshold for tenure. After her injury, though, her scores slipped below that recommended minimum threshold. This is not entirely surprising, since Schoper had to make substantial changes to her teaching, including slowing down classroom discussion.

To the extent that tenured positions at the University required a certain measure of teaching ability—here, a Part A average above 4.0—Schoper was required to demonstrate that she possessed the required skills for tenure. *See Bombard v. Fort Wayne Newspapers, Inc.*, 92 F.3d 560, 563 (7th Cir. 1996) ("First, we consider whether 'the individual satisfies the prerequisites for the position, such as possessing the appropriate educational background, employment experience, skills,

licenses, etc.'" (quoting 29 C.F.R. § 1630.2(m)). Simply put, the Act "does not shelter disabled individuals" if they are unable "to fulfill the requirements of the position as prescribed by the employer or fail[] to meet [their] employer's expectations." *Hammel v. Eau Galle Cheese Factory*, 407 F.3d 852, 862 (7th Cir. 2005) (cleaned up). "This is true even if, after further inquiry, an employer determines that the employee's inability to perform the job is due entirely to a disability." *Id.* at 865 (cleaned up). The requirements for tenure at the University included having superior teaching ability, and the University was not required to change these requirements for Schoper. *See Williams v. United Ins. Co. of Am.*, 253 F.3d 280, 282 (7th Cir. 2001) (employer "is not required to … waiv[e] his normal requirements for the job in question").

The undisputed evidence demonstrates that the average scores for Schoper's most recent classes fell below a 4.0, strongly suggesting she failed to meet the essential requirements for the job of tenured professor. If Schoper was not a qualified individual in the meaning of the Act, then the University had no obligation to accommodate her in the first instance.

Even if she was qualified, though, summary judgment was still appropriate. Schoper contends that the University failed to reasonably accommodate her traumatic brain injury by denying her additional time to demonstrate that she met the tenure criteria for teaching. During the application review process—after two negative recommendations, one from the Department chair and another from the Department committee—Schoper requested additional time to demonstrate that her Part A scores would once again rise above the 4.0 threshold. According to Schoper, the University

should have paused her tenure clock as soon as she submitted the recommendation from her neurologist. In that note, her neurologist wrote that he believed Schoper would be capable of returning to work at full capacity within a few months, and that she should be reconsidered for tenure at that point.

"A 'reasonable accommodation' is one that allows the disabled employee to 'perform the essential functions of the employment position,'" and we have recognized that "the concept of 'reasonable accommodation' is flexible." *Severson v. Heartland Woodcraft, Inc.*, 872 F.3d 476, 481 (7th Cir. 2017) (quoting 42 U.S.C. § 12111(8)). We have previously stated, though, that employers need not "excuse the inability" of an individual to perform the "job's essential tasks" or promote disabled individuals who do not meet the requirements for a promotion. *Byrne v. Avon Prods., Inc.*, 328 F.3d 379, 381 (7th Cir. 2003); *Li*, 110 F.4th at 996 ("[A] promotion is not a reasonable accommodation."). It is worth noting here that the University did provide Schoper some requested accommodations, including allowing her to teach the same classes she had previously taught, refrain from serving on faculty committees, and giving her certain physical accommodations. None of these are at issue here.

What is at issue here is Schoper's straightforward request for more time to achieve tenure. But what Schoper requested is not a reasonable accommodation. Instead, she effectively requested a do-over. This is evidenced by the fact that she did not request any accommodation until it became apparent that she would receive a negative tenure recommendation.

Schoper made the conscious decision to return to teaching quickly to hasten her recovery, taking the risk that her teaching scores could fall until she fully recovered. The evidence

indicates that Schoper was recovering: her Spring 2017 Part A scores showed a definitive upward trajectory, and it is entirely possible that, given more time, she would have once again met the teaching requirements for tenure. Nonetheless, Schoper points us to no authority that requires the University to insulate her from her chosen strategy. In fact, we have previously stated that requesting a second chance is not a reasonable accommodation when it does not request that the employer change anything, but rather simply requests an opportunity for the employee to change their behavior. *See, e.g.*, *Siefken v. Village of Arlington Heights*, 65 F.3d 664, 666–67 (7th Cir. 1995).

Accordingly, summary judgment was appropriate on Schoper's failure-to-accommodate claim.

### B.  Disability Discrimination

We now move to Schoper's disability discrimination claim. To prevail on a disability discrimination claim, a plaintiff "must show (1) she is disabled; (2) she is otherwise qualified to perform the essential functions of the job with or without reasonable accommodation; (3) she suffered an adverse employment action; and (4) the adverse action was caused by her disability." *Brooks v. Avancez*, 39 F.4th 424, 433 (7th Cir. 2022). At this stage, our task is straightforward: we ask whether the evidence, taken in the light most favorable to Schoper, would allow a reasonable factfinder to conclude that disability caused her termination. *Ortiz v. Werner Enters., Inc.*, 834 F.3d 760, 765 (7th Cir. 2016). Here, Schoper contends that the district court impermissibly made credibility determinations and ignored evidence. She is mistaken.

As a preliminary matter, we note that Schoper's disability discrimination claim faces the same uphill battle regarding whether she was qualified to perform the job of tenured professor. The record suggests Schoper was not a qualified individual in the meaning of the Act because she could not meet the essential requirements for the job of tenured professor.

Even if Schoper was a qualified individual, though, her claim still fails. Neither party disputes that Schoper was disabled or that she suffered an adverse employment action when the University denied her tenure application. Rather, the parties dispute whether Schoper's disability caused the University to deny her tenure application. Schoper must show us record evidence indicating that her traumatic brain injury was the "determinative factor" in the University's decision to deny her tenure. *Serwatka v. Rockwell Automation, Inc.*, 591 F.3d 957, 961 (7th Cir. 2010). "[P]roof of mixed motives will not suffice." *Id*. at 962.[1]

Schoper tells us that the reviewers' focus on her negative Part A scores reveals that they discriminated against her. There is no doubt that Schoper's disability affected these scores. Indeed, the traumatic brain injury required Schoper, by her own admission, to make substantial changes to the classroom experience, which caused some students to

---

[1] As we recognized in *Serwatka*, the ADA Amendments Act of 2008 changed the relevant language in the ADA, prohibiting discrimination "on the basis of" rather than "because of" a disability. *Id*., 591 F.3d at 961 n.1. The parties do not argue that the statutory language alters our causation standard, so we leave the resolution of any such argument for another case.

complain. The various reviewers in this case explicitly relied on the negative Part A scores.

But, to succeed on appeal, Schoper must demonstrate that a reasonable juror could find that her disability was the "but-for" cause of the reviewers' negative recommendations. Here, the reviewers did not look at Schoper's slipping Part A scores in isolation, but rather considered them alongside the comments left by students in Part B of their evaluations. None of the comments highlighted by the reviewers in their recommendations concerned Schoper's disability. On the contrary, reviewers highlighted comments identifying other shortcomings, including that Schoper played favorites with students; focused too much on students liking her; complained about other teachers; and struggled to handle feedback.

Rather than address these comments, Schoper urges us to focus on other supposedly disability-related comments that students left in her Part B evaluations. It is true that some of the student comments were quite troublesome, including those that compared Schoper to a weed that should be plucked from a garden and to a preschooler. Schoper contends that both comments are plainly discriminatory. We agree that the comments are problematic but cannot make the logical jump that Schoper requests. These comments just as easily could have been directed to teachers of questionable quality who are not disabled. Put simply, drawing discriminatory animus from two student comments—let alone expanding that animus to all the student comments—requires a speculative leap that no reasonable juror could make. And, most importantly, there is no evidence in the record that the reviewers relied on these comments in making their negative recommendations.

Schoper's arguments regarding comments made by two tenure reviewers fare no better. According to Schoper, the fact that a member of the Department committee suggested that she consider taking time off to recover indicates that he discriminated when recommending against tenure. She similarly contends that the Department chair's suggestion that she look into long-term disability benefits coverage after he recommended against tenure evidences discrimination.

But Schoper fails to causally connect either of these comments to the negative tenure decision. In the case of the committee member, the interaction occurred more than a year before Schoper applied for tenure. *See Castetter v. Dolgencorp LLC*, 953 F.3d 994, 997 (7th Cir. 2020) (noting that "isolated comments must be contemporaneous with termination or causally related to the termination process in order to be probative of discrimination"). As for the Department chair's comment, it was but one statement by a single reviewer in a multistep process—a process in which the University President had the final say on whether to recommend tenure. *See Adelman-Reyes v. Saint Xavier Univ.*, 500 F.3d 662, 667 (7th Cir. 2007) (recognizing that "because tenure decisions typically involve numerous layers of review by independent and University-wide committees, the causal connection between any possible discriminatory motive of a subordinate participant in the tenure process and the ultimate tenure decision is weak or nonexistent" (internal quotation marks omitted)).

Accordingly, no reasonable jury could find that Schoper's disability was a but-for cause of the University's decision not to grant her tenure.

**III.    Conclusion**

For the reasons stated herein, we AFFIRM.