In the

# United States Court of Appeals
## For the Seventh Circuit

———————

No. 07-2377

ANITA GARG,

*Plaintiff-Appellant,*

*v.*

JOHN E. POTTER, Postmaster General,
United States Postal Service,

*Defendant-Appellee.*

———————

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 05 C 3947—**Charles R. Norgle, Sr.**, *Judge.*

———————

ARGUED FEBRUARY 11, 2008—DECIDED APRIL 4, 2008

———————

Before BAUER, KANNE, and WILLIAMS, *Circuit Judges.*

KANNE, *Circuit Judge.* Anita Garg filed an employment-discrimination suit against the United States Postal Service under the Rehabilitation Act, *see* 29 U.S.C. § 794(a), alleging that the Postal Service failed to accommodate her disability and constructively discharged her. The district court granted summary judgment to the Postal Service after concluding that Garg was not permanently disabled, and that the Postal Service made reasonable accommodations to enable her to perform her job. We affirm.

## I. History

Because the district court granted summary judgment to the Postal Service, we recount the following facts in the light most favorable to Garg. *See Smith v. Potter*, 445 F.3d 1000, 1006 (7th Cir. 2006). After three stints at various locations throughout Illinois, Garg began her fourth job with the Postal Service in 1999, as a mail processor at its Palatine, Illinois facility. The Palatine facility—one of the Chicago area's major processing plants—sorts mail using large machines that emit microscopic fibers into the air. At the time of Garg's employment, the Palatine facility operated three eight-hour sorting shifts, or "tours," throughout the workday. Employees working on tour 1, the night shift, sorted the day's heaviest volume of mail—and as one might expect, tour 1 was the least popular among Postal Service employees. The sorters on tour 2 worked from morning until mid-afternoon, and the sorters on tour 3 worked from mid-afternoon until the beginning of the night shift. Garg began her tenure at Palatine on tour 3 as a "part-time flexible mail processor." In July 2000, Garg became a "full-time flexible regular mail processor," and was assigned to tour 1. Garg's duties included moving mail from mail bags into tubs and sorter machines.

Beginning in late 1999, after working at Palatine for about nine months, Garg began experiencing allergic reactions and respiratory difficulties at work, which she alleges resulted from her exposure to the particulate matter in the air. Garg sought medical treatment from a general internist and a dermatologist in 1999; the doctors recommended that Garg undergo allergy testing, and prescribed allergy medication. Despite receiving medical attention, Garg did not complain to the Postal Service about her allergy problems until being assigned to the night shift in July

2000. After working on tour 1 for roughly one month, Garg requested a reassignment to tour 2 or tour 3 because, she claimed, her allergy symptoms were aggravated by the increased dust from the higher volume of mail sorted at night. Garg also alleged that the more severe symptoms required her to take a higher dosage of her allergy medication, which induced drowsiness. In response to Garg's request, the Postal Service asked Garg to submit to a physical examination, which was conducted by Dr. William McMahon, a contract physician for the Postal Service. After conducting this examination and reviewing Garg's medical records, Dr. McMahon concluded that Garg's condition did not justify granting her request for a shift change.

Nevertheless, Garg's supervisor, Alan Lipschultz, granted Garg's request. Between September 2000 and April 2001, Garg was reassigned to tour 3 in the Palatine plant's data-conversion room, where Garg and other "data-entry operators" used computers to code mail for sorting purposes. Although this room was also a dusty environment, the data-entry operators were not usually required to physically handle mail as the other workers did when using the large sorting machines. Lipshultz allowed Garg to work on tour 3 despite the Postal Service's need to employ more workers on tour 1 (the busiest shift) and in contravention of established procedures. Although Garg would not have been eligible for a permanent reassignment—a shift change of more than 90 days—based on the plant's collective bargaining agreement, which mandated preference based upon seniority for such reassignments, the Postal Service allowed her to work as a data-entry operator for over seven months.

In April 2001, the Postal Service returned Garg to the night shift, but reduced the number of hours she was

required to work on that shift—instead of arriving at 11 p.m. and leaving at 8 a.m. like the other workers on tour 1, the Postal Service allowed Garg to arrive at 4 or 5 a.m. and work only the hours at the end of the shift. Garg nonetheless requested medical leave shortly after returning to the night shift because she claimed that the work environment of the Palatine plant exacerbated her allergies. Garg failed to report for work after making this request. On April 20, 2001, a plant supervisor denied Garg's request for medical leave because she had not submitted medical documentation to support it. The manager informed Garg that he would not approve her absence, and Garg returned to work. A few days later, Garg developed a skin rash and was taken to the emergency room. The emergency-room doctor treated Garg for the rash, prescribed Benadryl, and released her the same day; he instructed her not to work for one day. When Garg returned to work two days later, she again complained about a rash and was again taken to the emergency room. This time she was given a cortisone injection, again prescribed Benadryl, and told she could return to work that same day.

After these emergency room visits, the Postal Service scheduled Garg for a fitness-for-duty examination with Dr. Eva Ostrowski, another contract physician. Ostrowski examined Garg in May 2001 and concluded that based on Garg's reported symptoms and medical records, Garg was not fit for duty. However, Dr. Ostrowski did not attribute Garg's allergies to her work at the plant. Instead, Dr. Ostrowski advised Garg to undergo allergy testing so that the Postal Service could take steps to ensure a safe work environment for her. One week later, a plant supervisor sent a letter to Garg that said that as a result of Dr. Ostrowski's determination, Garg could not return to work until the definitive cause or lack of cause of her condition

was determined. The letter also requested that Garg undergo allergy testing and inform the Postal Service's medical unit about the results of those tests within seven days. Garg never responded to this letter, nor did she ask the Postal Service to place her in another job within or outside of the Palatine facility.

Garg received a second letter from the plant supervisor in August 2001, stating that Garg had not complied with the Postal Service's request for her allergy-test results. This letter informed Garg that she had to respond within five days, or her prolonged absence—which dated from the time of her fitness-for-duty examination in May 2001—would be considered as without leave. After several months passed without any communication from Garg, the Postal Service sent Garg an "options letter" in early October 2001. This options letter allowed Garg to elect one of three courses of action: (1) resignation from the Postal Service; (2) disability retirement, if she qualified; or (3) optional retirement. The options letter instructed Garg to notify the Postal Service of her election within ten days. Garg did not respond to this letter within ten days, but instead verbally told the Postal Service a month later that she wanted to schedule a retirement-counseling appointment. The Postal Service scheduled two such appointments, but Garg cancelled each time. After the second cancellation, the Postal Service sent Garg another letter, which stated that she would be separated from the Postal Service in 30 days because she was "unable to perform [her] duties."

Five months after receiving the separation letter, Garg finally underwent allergy testing. Garg had previously filed a workers' compensation claim with the United States Department of Labor's Office of Workers' Compensation

Programs (OWCP) in April 2001. OWCP denied her claim because it lacked medical substantiation, and instructed Garg to obtain further medical testing if she wished to pursue workers' compensation. In May 2002—one full year after the Postal Service first asked Garg to receive allergy testing—an allergy specialist, Dr. James Moy, determined that he could not conclude that Garg's employment with the Postal Service caused her dust allergy.

In July 2005, after exhausting her administrative remedies within the Postal Service, Garg filed this lawsuit asserting that the Postal Service failed to accommodate her disability and constructively discharged her in violation of the Rehabilitation Act. *See* 29 C.F.R. § 1614.407. In January 2007, after discovery, the Postal Service filed a motion for summary judgment, which argued that Garg was not disabled under the Rehabilitation Act, and, in any event, the Postal Service had reasonably accommodated her. The Postal Service's motion also argued that Garg's constructive-discharge claim was redundant to her failure-to-accommodate claim because Garg was actually discharged by the Postal Service in December 2001.

The district court granted summary judgment to the Postal Service in May 2007. The court ruled that Garg's allergy condition was temporary and therefore did not qualify her for accommodation under the Rehabilitation Act. The court further determined that despite this, the Postal Service had reasonably accommodated Garg by temporarily changing her shifts and by allowing her to work a reduced number of hours. The district court also held that Garg's constructive-discharge claim failed because she had been actually and justifiably discharged, and had not alleged that the Postal Service was a "hostile work environment." Garg subsequently filed this appeal.

## II. ANALYSIS

Garg argues on appeal that the district court erred by granting summary judgment to the Postal Service because she alleges that she established a *prima facie* case under the Rehabilitation Act. Specifically, Garg contends that she raised a genuine issue of material fact regarding whether she suffered from a disability under the terms of the Rehabilitation Act. However, Garg does not challenge the district court's holding that regardless of the nature of her condition, the Postal Service afforded reasonable accommodations to her. Likewise, Garg does not appeal the district court's grant of summary judgment to the Postal Service on her constructive-discharge claim.

We review the district court's grant of summary judgment *de novo*. *See Smith*, 445 F.3d at 1006. "Summary judgment is only appropriate where 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits . . . show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.' " *Id.* (quoting Fed. R. Civ. P. 56(c)); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). " 'We may affirm summary judgment on any basis we find in the record.' " *Winters v. Fru-Con Inc.*, 498 F.3d 734, 743 (7th Cir. 2007) (quoting *Aviles v. Cornell Forge Co.*, 183 F.3d 598, 603 (7th Cir. 1999)).

The Americans with Disabilities Act (ADA), 42 U.S.C. § 12111 *et seq.,* and Rehabilitation Act " 'prohibit an employer from discriminating against a qualified individual with a disability because of the disability.' " *Jackson v. City of Chicago*, 414 F.3d 806, 810 (7th Cir. 2005) (quoting *Silk v. City of Chicago*, 194 F.3d 788, 798 (7th Cir. 1999)). To establish a *prima facie* case under the Rehabilitation Act, Garg

must prove that she (1) falls within the ADA's statutory definition of "disabled," meaning that she has a "physical or mental impairment that substantially limits a major life activity, a record of such impairment, or [is] regarded as having such impairment," *see* 42 U.S.C. § 12102(2); (2) is otherwise qualified to perform the essential functions of her job, with or without reasonable accommodation; and (3) has suffered an adverse employment decision because of the disability. *Scheerer v. Potter*, 443 F.3d 916, 918 (7th Cir. 2006); *Peters v. City of Mauston*, 311 F.3d 835, 842 (7th Cir. 2002). We examine our precedent under the ADA to determine whether Garg has made out a *prima facie* case under the Rehabilitation Act. *Scheerer*, 443 F.3d at 919; *Jackson*, 414 F.3d at 810-11.

We have stated that an employer violates the ADA only if a terminated employee can establish that reasonable accommodations exist that would have enabled that employee to perform the essential functions of his or her job. *Hammel v. Eau Galle Cheese Factory*, 407 F.3d 852, 865-66 (7th Cir. 2005). This is because "the ADA does not shelter disabled individuals from adverse employment actions if the individual, for reasons unrelated to his disability . . . is not qualified for the job or is unable to perform the job's essential functions . . . ." *Hammel*, 407 F.3d at 862; *see also Williams v. United Ins. Co. of Amer.*, 253 F.3d 280, 282 (7th Cir. 2001). It is clear that a worker who cannot do the job even with a reasonable accommodation has no claim under the ADA. *See, e.g.*, *DePaoli v. Abbott Labs.*, 140 F.3d 668, 674 (7th Cir. 1998); *Matthews v. Commonwealth Edison Co.*, 128 F.3d 1194, 1195 (7th Cir. 1997). This is true even if the employee's inability to perform the job " 'is due entirely to a disability.' " *Hammel*, 407 F.3d at 865 (quoting *Matthews*, 128 F.3d at 1195).

Garg devoted her entire appellate brief, and the balance of oral argument, to her contention that the district court erred by finding that she was not disabled. But conspicuously absent is any argument that the district court erred by ruling that the Postal Service reasonably accommodated her; Garg has therefore waived this point. *See Local 15, Int'l Bhd. of Elec. Workers v. Exelon Corp.*, 495 F.3d 779, 783 (7th Cir. 2007) (" 'A party waives any argument that it does not raise before the district court or, if raised in the district court, it fails to develop on appeal.' " (quoting *Williams v. REP Corp.*, 302 F.3d 660, 666 (7th Cir. 2002))); *see also Heft v. Moore,* 351 F.3d 278, 285 (7th Cir. 2003) ("The failure to cite cases in support of an argument waives the issue on appeal . . . ."). This waiver is fatal to Garg's appeal because our ADA and Rehabilitation Act jurisprudence requires that, in order to establish her *prima facie* case, Garg must prove that she can perform the essential functions of a full-time flexible regular mail processor with or without reasonable accommodation. *See Scheerer*, 443 F.3d at 918; *Jackson*, 414 F.3d at 810, 813; *Hammel,* 407 F.3d at 865-66.

Here, Garg cannot prove this prong of her *prima facie* case because she did not perform the essential functions of her job even after the Postal Service made reasonable accommodations to her. The Postal Service accommodated Garg by reassigning her from tour 1 to tour 3 for seven months despite clear Postal Service policies that would ordinarily have precluded such an assignment. During much of this time, Garg worked as a data-entry operator and did not handle mail. The Postal Service then allowed Garg to work a reduced number of hours after she returned to tour 1. Garg never asked the Postal Service for any other accommodations and never introduced any evidence of other positions within the Postal Service that she was qualified to

fill. Despite these reasonable accommodations, Garg repeatedly missed work without permission, and by doing so failed to perform the essential functions of her job. Garg also entirely ignored several letters from the Postal Service requesting that she undergo and report the results of her allergy testing. Garg knew that she could not return to work without receiving allergy testing, but she did not submit to testing until five months after her termina-tion—one year after the Postal Service initially asked her to do so, and she only relented when she was required to submit to testing for her workers' compensation claim. After Garg continually avoided allergy testing and the Postal Service's exhortations, the Postal Service labeled her entire absence as without leave and terminated her em-ployment.

Garg's conduct clearly demonstrates her inability to perform her job. And we have held that "when the evi-dence demonstrates that an employee is incapable of performing the job, the employer need not isolate the disability-related causes for an employee's inferior perfor-mance from problems that stem from a poor attitude, insubordination, carelessness, or outright disregard for the safety of himself and his co-workers." *Hammel*, 407 F.3d at 865; *see also Waggoner v. Olin Corp.*, 169 F.3d 481, 484-85 (7th Cir. 1999).

Because Garg did not challenge the district court's determination that the Postal Service provided her reason-able accommodations, and because the record makes clear that Garg could not perform her job even with these accommodations, she has failed to establish the second required element of her *prima facie* case under the Rehabili-tation Act. *See Scheerer*, 443 F.3d at 918. We therefore need not evaluate the district court's conclusion that Garg was

not disabled within the meaning of the Rehabilitation Act. *See Springer v. Durflinger*, Nos. 06-2168 & 06-2516, slip op. at 8 (7th Cir. Feb. 29, 2008); *Smith*, 445 F.3d at 1009 n.20 ("[B]ecause we need not resolve this issue to dispose of [the] appeal, we reserve judgment . . . .").

### III. CONCLUSION

The district court's entry of summary judgment to the Postal Service is AFFIRMED.