In the

# United States Court of Appeals
## For the Seventh Circuit

No. 24-1734

AYLA ROYAN,

*Plaintiff-Appellant,*

*v.*

CHICAGO STATE UNIVERSITY and
ELMER GENTRY,

*Defendants-Appellees.*

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 1:20-cv-02014 — **Lindsay C. Jenkins**, *Judge.*

ARGUED JANUARY 28, 2025 — DECIDED JULY 22, 2025

Before HAMILTON, KIRSCH, and MALDONADO, *Circuit Judges.*

HAMILTON, *Circuit Judge.* Plaintiff-appellant Ayla Royan appeals the district court's grant of summary judgment for defendant-appellee Chicago State University (CSU) on Royan's claim for violation of Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794. Royan alleges that CSU dismissed her from its College of Pharmacy's Doctor of Pharmacy

program because of a disability. The district court held that Royan failed to present evidence from which a reasonable jury could find that CSU dismissed her solely based on her disability. We affirm.[1]

Even when the evidence is viewed in the light most favorable to Royan, it shows that CSU repeatedly accommodated her disabilities and applied its academic standards without discrimination. CSU placed Royan on probation and then ultimately dismissed her from the program after she failed two clinical rotations that she was required to pass in order to graduate. Royan has not presented sufficient evidence to support a reasonable inference that CSU's stated reason for her dismissal—her repeated academic failures—was pretextual.

The Rehabilitation Act protects individuals with disabilities from discrimination based on those disabilities. It does not, however, exempt students from meeting legitimate academic standards. Nor does it require institutions that reasonably accommodate a student's disabilities to lower those standards. Where, as here, undisputed evidence shows that a university consistently accommodated a student's disability and applied its academic policies without discrimination, summary judgment is appropriate.

I.   *Factual and Procedural History*

A.   *CSU's Program and Policies*

CSU is a public university that operates a four-year Doctor of Pharmacy program. The program's first three years consist

---

[1] Royan also named as a defendant and appellee Dean Elmer Gentry, but she has not pursued on appeal any argument for holding Gentry personally liable under the Rehabilitation Act.

of classroom-based instruction. In the final year, students complete advanced pharmacy practice experiences referred to as clinical rotations. Students must pass the clinical rotations to graduate.

CSU's College of Pharmacy maintains a student handbook detailing academic policies, including conditions for probation, repeating courses, and dismissal. According to the handbook, a student who fails a course is placed on probation and receives written notice that continued poor performance may lead to dismissal. The Academic Standing Committee, consisting of several assistant deans and department chairs, determines the requirements for a student's return to good academic standing and may decide to dismiss a student. Students may appeal adverse decisions from the committee to the Dean of the College of Pharmacy, whose decision is final.

B. *Royan's History with the Program*

Plaintiff Royan enrolled in the doctoral program in 2014. In 2016, she disclosed to CSU personnel that she had been diagnosed with clinical depression and an eating disorder. CSU accommodated her medical conditions by granting extensions for exams and assignments. CSU later approved a year-long medical leave starting in August 2017. Following her medical leave, Royan returned to the program in September 2018 and advanced to the clinical rotation phase in the spring of 2019.

C. *Royan's First Clinical Rotation*

Royan's first clinical rotation, supervised by Dr. Shivani Patel of the University of Chicago, began without incident. During her first week, Royan disclosed to Dr. Patel that she had a gynecological condition that could cause her to appear

pale, sweat excessively, and move slowly. Approximately one week later, a CSU administrator emailed Dr. Patel to confirm whether Royan was meeting course expectations and to remind her of the upcoming due date for Royan's mid-rotation evaluation. Dr. Patel did not report any concerns about Royan's performance in response. But, as Royan testified in her deposition, Dr. Patel had criticized her performance in at least three prior conversations with Royan herself. Specifically, Dr. Patel criticized Royan for failing to locate a clinical guideline for a particular illness (which Royan contends did not exist), for not adhering to privacy requirements, and for performing poorly during a mock patient consultation.

The rotation took a decisive turn when Dr. Patel scheduled a meeting with Royan for March 6 to review her performance. Royan appeared visibly upset when she arrived at the meeting. She told Dr. Patel about her diagnoses, her previous hospitalizations, and a recent change in her psychiatric care. The parties disagree about what happened next. According to Royan, Dr. Patel reacted poorly after hearing about Royan's health struggles. She testified that Dr. Patel told her she was "too sick" to complete the rotation successfully, said she would feel responsible if Royan hurt herself, and said that Royan was incapable of being a pharmacist. Royan further claims Dr. Patel criticized her for being sweaty and slow, suggested she should be a pharmacy technician rather than a pharmacist, and recommended that she take a break from her coursework to address her health. Royan described feeling shocked and distraught by these statements.[2]

---

[2] Dr. Patel provides a different account of that meeting, though we must credit Royan's for purposes of summary judgment. Dr. Patel testified

Dr. Patel's mid-rotation written evaluation for CSU—which was formally submitted nearly two weeks late on March 11—described Royan's deficient performance. Dr. Patel noted that Royan "has deficits in her clinical knowledge and patient care interactions," that she "has a lot of work ahead of her," and that she "has not demonstrated readiness and ability to fully conduct patient counseling independently." Dr. Patel also observed that Royan "was very tearful and did not demonstrate the capacity to proceed with [the] rotation and the ability to take on the rigor required to successfully learn the foundations of ambulatory care." Nonetheless, Royan wished to continue with the rotation and to improve.

Shortly after this emotional meeting, Dr. Patel emailed Rachel Prusi, an administrator at the University of Chicago, wishing to talk about Royan. The two met that day, and Prusi contacted CSU's Dr. Charisse Johnson (Assistant Dean) and Dr. Elsa Bishop (Contract Pharmacist) to raise her concerns about Royan. The group met the following day, March 7.

In a follow-up email summarizing the meeting, Dr. Patel expressed concern for Royan's well-being and again doubted her capacity to continue in the rotation. Dr. Patel said she had advised Royan to consider medical leave or other support options, but Royan had declined. In a separate message that day, Dr. Patel elaborated on Royan's performance, writing that she was "not meeting the expectations of this rotation" and had accidentally included a lethal dose on a mock drug chart.

---

that the conversation centered primarily on Royan's deficient performance in the rotation rather than her medical conditions.

Dr. Johnson responded that CSU was working to ensure Royan had access to appropriate support. She told Dr. Patel that Royan would not return to the rotation the following day and that she was coordinating with CSU police and the Behavioral Assessment and Intervention Team (BAIT) before scheduling a meeting with Royan by March 8. When Royan learned that she was to meet with Dr. Johnson instead of attending her rotation, she called Dr. Patel. According to Royan, Dr. Patel repeated her concern that Royan might harm herself and said she (Patel) would be responsible if that occurred.

On March 8, Dr. Johnson and Dr. Bishop met with Royan. According to a follow-up email, they discussed concerns with Royan's "clinical knowledge, inability to counsel patients independently, and need for improvement to identify/solve drug therapy related problems." Dr. Johnson warned that, without significant improvement, Royan was at risk of failing the rotation. She also reminded Royan of available support resources. Royan does not dispute that these topics were raised, but she maintains the primary focus was her disabilities. At the end of the meeting, Royan agreed to return to Dr. Patel's rotation the following Monday, March 11.

Royan returned on March 11, but the parties again dispute what happened next. Both agree that Royan presented her "journal club presentation," a capstone project for the rotation. Royan claims Dr. Patel initially ignored her, then asked, "[w]hy did you come back? I told you not to come back here, I told you your grade was F," before harshly criticizing her presentation for over an hour, allegedly calling it "b***s***."

Royan called Dr. Bishop immediately afterward. According to Dr. Bishop, Royan was "in hysterics, crying and audibly upset" over Dr. Patel's feedback on her presentation. Royan

told Dr. Bishop that she would refuse to return to the site and did not care if she received a failing grade. Royan testified that Dr. Bishop then told her to leave the site. Later that afternoon, Dr. Patel emailed Royan requesting she return. Royan did not respond.

Later in the evening of March 11, Dr. Johnson emailed Royan instructing her not to return to the site the next day and promising to follow up later in the week. Dr. Johnson separately contacted Dr. Patel, who said the day had been "relatively normal" and that she had simply offered feedback on the journal club assignment.

Dr. Johnson, Dr. Bishop, Dr. Patel, and Rachel Prusi met to assess the situation. A summary email following the meeting reiterated concerns about Royan's ability to meet clinical expectations and to receive feedback. Because Royan had indicated she would not return to the site, the group agreed to identify an alternative placement. The email also referred to "serious concerns about this student's safety and well-being" and requested that CSU conduct regular wellness checks on Royan.

On March 12, Dr. Patel reported that an anonymous student told her Royan had threatened to commit suicide if she failed the rotation—a claim Royan denies. Dr. Johnson relayed the report to CSU legal counsel, who scheduled Royan to meet with the BAIT team on March 14. Unaware of these developments, Royan emailed Dr. Johnson and Dr. Bishop that day, defending her performance. She admitted to some mistakes but claimed Dr. Patel had predetermined that she should not continue in the rotation. Royan added that her decision not to return to the site was not emotional but based on deteriorating mental and physical health since March 6.

The scheduled March 14 meeting was delayed to March 21. At that meeting, Royan was informed she would receive a failing grade for the rotation. The stated basis for the grade was that Royan had voluntarily withdrawn and refused to return. Royan contends the real reason was CSU's fear of liability based on her disabilities, citing the presence of BAIT team members at the meeting and their questions about her treatment and medications.

D.  *Probation and Appeal*

After CSU failed Royan in her rotation with Dr. Patel, the Academic Standing Committee informed Royan that she would have to attend a meeting to discuss the requirements for continuing in the program. The committee—comprised of faculty, department chairs, and the Associate Dean of Academic Affairs—met with Royan on March 26. There is no evidence in the record that committee members other than Dr. Johnson were aware of Royan's disabilities at the time of the meeting.

At the meeting, the committee placed Royan on academic probation and outlined steps she would need to take to return to good academic standing. These steps included successfully repeating her clinical rotation with a different instructor.

Royan appealed her probation to then-Dean Elmer Gentry on April 15. Two weeks later, having received no response, she emailed Dean Gentry expressing distress over Dr. Patel's evaluation and frustration that her years of effort, while managing treatment, had been overlooked. Gentry replied that no decision had been made.

Gentry met with Royan as a part of the appeal. According to Royan, Gentry told her she was not capable of working as

a pharmacist "because of [her] health" and that the program would be responsible if she harmed herself. Gentry denied the appeal on May 10.

As part of her probation, Royan was assigned to a new clinical rotation with Dr. Daniel Kerner beginning June 6, 2019. Royan had previously taken a course with Dr. Kerner, which she passed with a "C," but he had told her that she would have failed if the class had been a clinical rotation. Royan immediately objected to the assignment, citing prior negative experiences, though she later acknowledged in her deposition testimony that Dr. Kerner was unaware of her mental health diagnoses.

Dr. Kerner provided Royan with weekly progress reports, which were largely critical. They noted deficiencies in professionalism, difficulty receiving feedback, and persistent knowledge gaps. After Royan responded defensively to one report, Dr. McClain, a program administrator, warned her that continued resistance to feedback could jeopardize her standing in the program. Royan does not dispute that she made mistakes, but she maintains that Dr. Kerner's feedback was colored by personal animus.

Royan ultimately failed the rotation. She was surprised, believing she had performed well on her final presentation. Dr. Johnson summarized several reasons for her failure, including excessive absences, emotional outbursts, difficulty communicating with providers, and lack of clinical improvement. Following this second failure, the committee dismissed Royan from the doctoral program.

On August 9, 2019, Royan appealed her dismissal to Dean Gentry through counsel. Her appeal reiterated concerns

about Dr. Patel's treatment and claimed that Dr. Kerner was "verbally abusive," allegedly telling her she failed because of an argument and a lack of professionalism.

Dean Gentry forwarded the appeal to CSU's legal department according to university protocol. On November 13, 2019, CSU's counsel referred the matter to Dr. Matthew Fete, who had replaced Gentry as dean of the College of Pharmacy. Dean Fete denied the appeal, concluding the committee had followed due process and complied with institutional policy.

Royan then filed this lawsuit, alleging that her dismissal violated Section 504 of the Rehabilitation Act and the Americans with Disabilities Act of 1990 (ADA), 42 U.S.C. § 12132, and that Dean Gentry violated her Fourteenth Amendment due process rights (actionable under 42 U.S.C. § 1983) by failing to resolve her appeal in a timely manner. Defendants moved for summary judgment on all claims, which the district court granted. Royan appeals only the court's grant of summary judgment on her Rehabilitation Act claim against CSU.

II.  *Analysis*

We review de novo the district court's grant of summary judgment, viewing conflicts in the evidence in the light most favorable to Royan, as the non-moving party, and drawing all reasonable inferences in her favor. E.g., *Navratil v. City of Racine*, 101 F.4th 511, 518–19 (7th Cir. 2024). Summary judgment is appropriate when the moving party shows there is no genuine dispute as to any material fact and it is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). "A dispute of material fact is genuine 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'"

*Johnson v. Dominguez*, 5 F.4th 818, 824 (7th Cir. 2021), quoting *Zaya v. Sood*, 836 F.3d 800, 804 (7th Cir. 2016), quoting in turn *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

Section 504 of the Rehabilitation Act provides in relevant part: "No otherwise qualified individual with a disability … shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance …." 29 U.S.C. § 794(a). To show a violation of the Rehabilitation Act, the plaintiff must satisfy four elements: "(1) the plaintiff must be a handicapped individual as defined by the Act; (2) the plaintiff must be 'otherwise qualified' for participation in the program; (3) the program must receive federal financial assistance; and (4) the plaintiff must have been 'denied the benefits of the program solely because of [her] handicap.'" *Reed v. Columbia St. Mary's Hospital*, 915 F.3d 473, 484 (7th Cir. 2019), quoting *Mallett v. Wisconsin Division of Vocational Rehabilitation*, 130 F.3d 1245, 1257 (7th Cir. 1997).

With an important exception, "[t]he Rehabilitation Act expressly incorporates the standards and procedures applicable to claims brought under the Americans with Disabilities Act." *Swain v. Wormuth*, 41 F.4th 892, 897 (7th Cir. 2022). The two statutes differ in their causation requirements: "The Rehabilitation Act has a stricter causation requirement: the plaintiff's disability must be the *sole* reason for the alleged discriminatory action; this contrasts with the ADA, which requires only that the plaintiff's disability be *a* reason for the challenged action." *Conners v. Wilkie*, 984 F.3d 1255, 1260 (7th Cir. 2021) (emphases in original). Apart from the issue of causation, precedents applying either statute are instructive. See *Garg v. Potter*,

521 F.3d 731, 736 (7th Cir. 2008) ("We examine our precedent under the ADA to determine whether [plaintiff] has made out a *prima facie* case under the Rehabilitation Act.").

Royan failed to raise a genuine issue of material fact on two of those four elements. First, the undisputed facts show she was not "otherwise qualified" to continue in the doctoral program, and she has offered insufficient evidence of pretext to call into question the legitimacy of CSU's stated reasons for her dismissal. Second, no reasonable jury could conclude that CSU dismissed her solely because of her disabilities. We address each issue in turn.

A.  *Royan Was Not "Otherwise Qualified"*

Royan was not "otherwise qualified" because she failed two clinical rotations that she was required to pass in order to continue in the program. "In the context of a university, a person is 'otherwise qualified' if she is able to meet all of the program's requirements in spite of her disability, with or without a reasonable accommodation." *Khan v. Midwestern University*, 879 F.3d 838, 844 (7th Cir. 2018). As a general matter, we afford substantial deference to academic institutions when it comes to decisions involving a student's qualifications or promotion within an educational program. *Regents of University of Michigan v. Ewing*, 474 U.S. 214, 225–26 & n.11 (1985).

Academic judgments are entitled to deference, particularly where they concern the professional standards and academic requirements of an educational program. See *Board of Curators of University of Missouri v. Horowitz*, 435 U.S. 78, 96 n.6 (1978) (Powell, J., concurring) ("University faculties must have the widest range of discretion in making judgments as to the academic performance of students and their

entitlement to promotion or graduation."). When reviewing claims of discrimination in academic settings, we are mindful that "academic judgments often rest on necessarily 'subjective judgments about academic potential.'" *Novak v. Board of Trustees of Southern Illinois University*, 777 F.3d 966, 976 (7th Cir. 2015), quoting *Vanasco v. National-Louis University*, 137 F.3d 962, 968 (7th Cir. 1998). However, "[a]cademic institutions are in no way exempt from our discrimination laws. Nor are there separate and more lenient standards for them. But, when assessing the evidence in such cases, courts must understand the nature and mission of the institutions and evaluate the evidence accordingly." *Id.*

CSU argues that Royan was not "otherwise qualified" because undisputed evidence shows that she failed to meet the program's academic requirements. She did not complete Dr. Patel's rotation after refusing to return following her journal club presentation, leading the committee to place her on academic probation. She then failed to satisfy the terms of that probation by failing Dr. Kerner's rotation, an instructor who, by Royan's own admission, was unaware of her disabilities. Under CSU policy, Royan's failure to satisfy her probationary conditions by failing a second rotation permitted the committee to dismiss her from the program.

Both Dr. Patel and Dr. Kerner raised concerns about Royan's clinical knowledge, professionalism, and ability to meet required performance standards. CSU maintains that the committee's decision to dismiss Royan was based solely on these academic deficiencies and followed established procedures. Royan does not directly challenge this contention. Instead, she relies on her strong performance in other courses to argue that she was "otherwise qualified" to continue. Good

performance in some courses, however, does not mean that Royan was "otherwise qualified" after failing to meet all the academic standards necessary to advance in the program.

We rejected a similar argument in *Khan v. Midwestern University*, 879 F.3d 838 (7th Cir. 2018). There, the plaintiff failed three first-year courses in medical school, making her eligible for dismissal under the university's academic policies. *Id.* at 840. Rather than dismissing her immediately, the university allowed her to repeat those courses and to continue with her course of study. Although she passed the repeated courses, she failed other courses in her second year. Following those failures (and while pregnant) she was dismissed from the program. She sued under Section 504 of the Rehabilitation Act, alleging discrimination based on her pregnancy-related disabilities.

We affirmed summary judgment for the university, concluding that Khan was not "otherwise qualified" to remain in the program after failing to meet its academic standards. *Id.* at 847. We emphasized that universities generally have broad, though not unreviewable, discretion to set academic standards and to enforce them. Although Khan argued she was "otherwise qualified" because she passed several courses, the university required students to avoid accumulating a specified number of failures to continue in the program. Because Khan did not meet that requirement, we held that undisputed facts showed she was not "otherwise qualified" under the Rehabilitation Act. *Id.* at 845.

The reasoning of *Khan* applies here. Like the student in *Khan*, who failed multiple courses and was placed on academic probation, Royan failed her initial clinical rotation with Dr. Patel and was similarly placed on probation. Also as in

*Khan*, where the plaintiff was given a second chance to pass, the committee allowed Royan to repeat her rotation with a different preceptor. And even more like *Khan*, Royan was unable to remedy her academic deficiencies, failing her second rotation with Dr. Kerner—who, according to Royan's own testimony, was unaware of her disabilities. This failure constituted a breach of the terms of her probation and allowed the committee to dismiss her from the program under CSU policy. Royan's strong performance in other courses does not change these undisputed facts. No reasonable jury could find that Royan was "otherwise qualified" within the meaning of the Rehabilitation Act.

To show that she was "otherwise qualified" for the doctoral program, Royan argues that Dr. Patel, Dr. Kerner, and other CSU administrators were lying about the reasons for dismissing her from the program. In discrimination litigation, such arguments are usually framed in terms of "pretext," which means "a lie, specifically a phony reason for some action.'" *Collins v. American Red Cross*, 715 F.3d 994, 1000 (7th Cir. 2013), quoting *Millbrook v. IBP, Inc.*, 280 F.3d 1169, 1175 (7th Cir. 2002). But on this record, there is no genuine issue of fact about the honesty of CSU's stated reason for dismissing Royan—her failure of two clinical rotations. We have said repeatedly in employment cases that the relevant question is not whether the defendant's decision was wise or even accurate, but "whether the employer honestly believed the reasons it has offered to explain the discharge." *Id.*, quoting *Coleman v. Donahoe*, 667 F.3d 835, 852 (7th Cir. 2012). The same standard applies in this educational setting.

To establish pretext, Royan must point to evidence that would let a reasonable jury find that the committee's

explanation for her dismissal was dishonest. She has not done so. She points to no evidence suggesting that her preceptors' evaluations—or the committee's decision to dismiss her after two failed rotations—were dishonest or the result of discriminatory animus. Nor has she cited any legal authority supporting her position that CSU's stated reason for dismissing her from the program was pretextual. On that ground alone, we could deem her pretext argument waived. See *Rahn v. Board of Trustees of Northern Illinois University*, 803 F.3d 285, 295 (7th Cir. 2015) (finding waiver where plaintiffs "failed to cite any legal authority in support of their argument" and collecting cases); *Yasinskyy v. Holder*, 724 F.3d 983, 989 (7th Cir. 2013) (courts of appeals "will not entertain baseless and unsupported factual contentions or undeveloped legal arguments"); Fed. R. App. P. 28(a)(9)(A) (requiring that appellant's brief include "contentions and the reasons for them, *with citations to the authorities* and parts of the record on which the appellant relies") (emphasis added). Regardless, the record does not support a reasonable finding of pretext.

Our decision in *Novak v. Board of Trustees of Southern Illinois University*, 777 F.3d 966 (7th Cir. 2015), guides the analysis. In *Novak*, we affirmed summary judgment for a university that dismissed a student from its program after he failed preliminary examinations required for advancement, despite having been granted multiple disability-based accommodations. *Id.* at 976–77. The student sued under the Rehabilitation Act, alleging that the university's stated reason for his dismissal—failure to meet its academic standards—was a pretext for discrimination. *Id.* at 969. We disagreed. Although the plaintiff had pointed to "perceived faults in the faculty's evaluation methodology," none of those criticisms, even if taken as true, supported an inference of pretext. *Id.* at 976–77. At most, the

record reflected possible "error in the course of a faculty member's evaluation of the student's work." *Id.* at 976. As we noted, "[t]here is no evidence that the faculty members' grading of Mr. Novak's Preliminary Examination was anything other than an honest, professional evaluation of his potential …." *Id.* at 977.

So too here. Like the plaintiff in *Novak*, Royan identifies no evidence suggesting that her preceptors' evaluations, or the committee's ultimate decision, were anything other than honest academic judgments. Also as in *Novak*, the record reflects that CSU repeatedly accommodated Royan "to ensure that h[er] disability did not interfere with h[er] having a fair opportunity to meet the University's standards" for the program. *Id.*

Moreover, Royan does not meaningfully dispute the substance of her preceptors' evaluations. For example, in one exchange with CSU administrators, she acknowledged that Dr. Patel's criticisms of her work were "absolutely correct." Dkt. 127-22 at 2. She also expressly admitted that the decision to leave Dr. Patel's rotation—the action that directly led to her failure—was her own. She wrote:

> At this point I know Im [sic] not going to learn anything from Dr. Patel anymore. I know she already made up her mind that I shouldn't go to any rotations. *My decision* to not go back to the site is not emotionally [sic] because I know myself, I don't quit easily. *I made this decision* because since Wednesday Ive [sic] been in a very bad place mentally & physically even though, I started fresh on Monday & thanked her for giving me another chance. But if a preceptor who

> barely has spent 30 minutes with me in a day
> during these 4 weeks suddenly spend [sic] 2.5
> hours criticizing me, questioning my intelli-
> gence, and make [sic] me feel stupid in a very
> unprofessional way, obviously is not willing to
> teach me anything more.

Dkt. 127-22 at 2 (emphases added). This admission further weakens Royan's pretext argument. By acknowledging that the decision to leave Dr. Patel's rotation was her own, Royan confirmed that her dismissal was tied to her voluntary actions rather than a concealed discriminatory motive on the part of CSU.

To the extent Royan contends that she left her rotation with Dr. Patel at Dr. Johnson's direction rather than voluntarily, her own account of the events contradicts that claim. Royan cannot create a genuine dispute of material fact when the record plainly refutes her version of events. See *Scott v. Harris*, 550 U.S. 372, 380 (2007) ("When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment."). Because Royan admits that she decided not to return to her rotation with Dr. Patel, she cannot fault Dr. Johnson.

In sum: the undisputed facts show that Royan failed two clinical rotations that she was required to pass in order to graduate. She has not presented evidence that those failures were the result of anything other than legitimate academic assessments, and CSU consistently accommodated her disabilities throughout her time in the program. On this record, no reasonable jury could conclude that CSU's stated reason for

dismissing Royan was a pretext for discrimination. She was not "otherwise qualified" for the doctoral program, as required to show a violation of the Rehabilitation Act.

B. *Royan was not Dismissed Solely Because of her Disabilities*

Royan's claim also fails because she cannot show that CSU dismissed her from the program solely by reason of her disability. 29 U.S.C. § 794(a). To survive summary judgment, Royan's disability "must be the *sole* reason for the alleged discriminatory action…." *Conners v. Wilkie*, 984 F.3d 1255, 1260 (7th Cir. 2021) (emphasis in original). The parties devote significant attention in their briefs to the proper standard of causation under the Rehabilitation Act. Although Royan's position on this point is not entirely clear, she appears to argue that a "but-for" causation standard should apply. Her theory, as best we can discern, is that but for her disclosure of her illness to Dr. Patel, she would not have failed that rotation, would never have been placed on probation or assigned to Dr. Kerner to repeat her rotation, and ultimately would not have been dismissed from the program. For its part, CSU advocates for a stricter causation standard, that "Royan's burden under Section 504 [of the Rehabilitation Act] requires her to prove that her disability was the sole reason for her dismissal." CSU is correct.

Our precedent makes clear that the Rehabilitation Act's causation standard is more stringent than the ADA's "but for" inquiry. See *Swain v. Wormuth*, 41 F.4th 892, 899 (7th Cir. 2022) ("The 'solely by reason of' causation standard is stricter than the causation standard in Title I of the ADA, which the Rehabilitation Act otherwise incorporates for its liability standards."); *Conners*, 984 F.3d at 1260.

Royan has not produced evidence that would let a reasonable jury find that CSU dismissed her solely because of her disabilities. She failed her second and final clinical rotation under Dr. Kerner, and she acknowledged in her deposition and in her response to CSU's statement of undisputed material facts that Dr. Kerner was unaware of her depression and eating disorder when he failed her. Absent evidence that Royan's disabilities influenced Dr. Kerner's decision to fail her, no reasonable jury could find that CSU dismissed her "solely by reason of" her disabilities.

We reached a similar conclusion in *Hedberg v. Indiana Bell Telephone Co.*, 47 F.3d 928 (7th Cir. 1995). There, we affirmed summary judgment for the employer in an ADA disability discrimination case because there was no genuine dispute that the decision-maker lacked knowledge of the plaintiff's disability at the time of his termination. *Id.* at 931–32.

The same is true here. Both Royan and Dr. Kerner confirmed that Dr. Kerner was unaware of her disabilities when he failed her. This lack of knowledge forecloses any reasonable likelihood that Dr. Kerner's decision to fail Royan was motivated by animus toward her or her disabilities. As we explained in *Hedberg*: "[T]here are situations in alleged disability discrimination cases where an employer clearly did not know … of an employee's disability. We think that an employer cannot be liable under the ADA for firing an employee when it indisputably had no knowledge of the disability." *Id.* at 932; see also, e.g., *Morisky v. Broward County*, 80 F.3d 445, 448 (11th Cir. 1996) (citing *Hedberg* with approval and rejecting the "contention that a plaintiff can sustain a prima facie case of handicap discrimination without proof that an employer had actual or constructive knowledge of an applicant's

disability"); *Crandall v. Paralyzed Veterans of America*, 146 F.3d 894, 896–97 (D.C. Cir. 1994) ("The courts of appeals have overwhelmingly agreed" that to establish the necessary causal link for Rehabilitation Act claims, the decision-maker "must have acted with an awareness of the disability itself…."). If Dr. Kerner had no knowledge of Royan's disabilities, they could not have been a reason—let alone the sole reason—for his decision to fail her.

Conceding that Dr. Kerner was unaware of her disabilities, Royan argues that his lack of knowledge does not preclude liability. She invokes a variant of the "cat's paw" theory of liability under which a jury could impute the discriminatory animus of other actors to Dr. Kerner's decision to fail her. See *Johnson v. Koppers, Inc.*, 726 F.3d 910, 914 (7th Cir. 2013) (describing the cat's paw theory of liability). To prevail under the cat's paw theory, Royan must show that Dr. Patel, motivated by discriminatory intent, "concocted a false story about [Royan], and that [Patel's] story was the proximate cause of [her] termination." *Id.* at 915.

Royan argues that CSU deliberately assigned Dr. Kerner—who had previously signaled a willingness to fail her—to supervise her second rotation in order to set her up for failure.[3]

---

[3] Royan asserted in her briefing and oral argument that Dr. Kerner threatened to fail her if given the chance. The record simply does not support that claim. By Royan's own account, Dr. Kerner observed that if her earlier work with him had been part of a required six-week clinical rotation, she would not have passed. See Dkt. 127-2 at 258:4–7. That comment, while cautionary, cannot be reasonably construed as a threat. Rather, it appears to have been an ordinary and frank evaluation of her performance and a warning that improvement would be necessary to meet the

We rejected a similar argument in *Hedberg*, where the plaintiff asserted that an intermediate supervisor who knew of his disability must have informed the supervisor who made the termination decision. 47 F.3d at 931. We found that inference to be "unsupported speculation" and therefore "not reasonable," especially given the lack of evidence that any such communication had occurred. *Id.*

So too here. Royan's proposed inference, that Dr. Kerner must have known about her disabilities simply because Dr. Patel did, is speculative and unsupported by the record. As in *Hedberg*, Royan has identified no evidence of *any* communication between Dr. Patel and Dr. Kerner, much less any discussion of her disabilities, foreclosing any possibility of discrimination by Dr. Kerner. As for her cat's paw theory, Royan has failed to point to any evidence that the committee was even aware of her prior conflict with Dr. Kerner or that the committee's assignment was motivated by discriminatory intent.

Without any evidence of communication between Dr. Patel and Dr. Kerner, there is no reasonable basis to infer that Dr. Patel disclosed Royan's disabilities to Dr. Kerner or encouraged him to discriminate against Royan on that basis. Similarly, absent evidence that the committee was aware of the prior friction between Royan and Dr. Kerner, no reasonable jury could conclude that it assigned her to his supervision in order to sabotage her repeat rotation.

In both of her rotations, Royan received evaluations that consistently cited deficiencies in key areas such as attendance,

---

program's academic standards. Such evaluations in an academic setting are not the stuff of discrimination lawsuits.

professionalism, clinical reasoning, and patient care. These are not marginal issues; they are core competencies essential to pharmacy practice. The university is entitled to enforce those standards, particularly in fields such as this, where failure to meet training standards can endanger future patients. At bottom, Royan's theory rests on conjecture. But conjecture, without supporting evidence, is not enough to defeat summary judgment. On this record, no reasonable jury could conclude that Royan was "otherwise qualified" to remain in the program or that CSU dismissed her solely based on her disabilities.

AFFIRMED.